27 F.3d 850
 29 Fed.R.Serv.3d 1272
 FEDERAL DEPOSIT INSURANCE CORPORATION, As Receiver for the
First National Bank of Toms River, New Jersey
v.
Lawrence E. BATHGATE, II; Novasau Associates, A New Jersey
Limited Partnership; New NAS, Inc.; T. Pamela Bathgate;
54 Buena Vista Associates, A New Jersey Limited Partnership;
Tuscol Development, Inc., A New Jersey Corporation; Old
Monmouth Associates, A New Jersey Partnership; Airport
Associates, A New Jersey Partnership; Gerald A. Gura; the
Club at West Deptford, A Limited Partnership, A New Jersey
Limited Partnership; State of New Jersey; Columbia Savings
and Loan Association; Asset Recovery Management, Inc.;
William Bowman Associates, Inc.; National Westminster Bank
NJ, Successor To First Jersey National Bank/South.
Lawrence E. BATHGATE, II; Novasau Associates; New NAS,
Inc.; 54 Buena Vista Associates, A New Jersey Limited
Partnership; Tuscol Development, Inc., A New Jersey
Corporation; Old Monmouth Associates, A New Jersey
Partnership, Third-Party Plaintiffs,
v.
William BARLOW; John C. Fellows, Jr.; Ebert L. Hall;
Joseph P. Iaria; David E. Johnson, Jr.; Irene F. Kramer;
Jacqueline F. Pappas; John F. Russo; Leonard G. Lomell;
Office of the Comptroller of the Currency; John McDougal,
Third-Party Defendants.
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for the
First National Bank of Toms River
v.
NLA ASSOCIATES LIMITED PARTNERSHIP, A New Jersey Limited
Partnership; LGP-I Limited Partnership, A New Jersey
Limited Partnership; LGP-I Capital Corp., A New Jersey
Corporation; New NAS, Inc.; Lawrence E. Bathgate, II;
Alan B. Landis; Novasau Associates, A Limited Partnership,
A New Jersey Limited Partnership.
Lawrence Bathgate, II; Novasau Associates, Limited
Partnership; New NAS, Inc.; 54 Buena Vista Associates;
Tuscol Development, Inc.; and Old Monmouth Associates (the
Bathgate defendants), Appellants.
 Nos. 93-5328, 93-5507.
 United States Court of Appeals,
Third Circuit.
 Argued March 25, 1994.
Decided May 5, 1994.
 
 Paul R. Rosen (argued), Bruce S. Marks, Spector, Gadon & Rosen, P.C., Philadelphia, PA, for appellants.
 Ann S. Duross, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, John P. Parker (argued), Sr. Atty., F.D.I.C., Washington, DC, Craig M. Lessner, Michael O'B. Boldt, Bourne, Noll & Kenyon, Summit, NJ, for appellee F.D.I.C.
 Joel M. Leifer (argued), Mark H. Moore, Daniel Hume, Hertzog, Calamari & Gleason, New York City, for appellees William Barlow, John C. Fellows, Jr., Ebert L. Hall, Joseph P. Iaria, David E. Johnson, Jr., Irene F. Kramer, Jacqueline F. Pappas, and Leonard G. Lomell.
 Before: GREENBERG, COWEN, and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I. FACTUAL AND PROCEDURAL HISTORY
 A. Factual History
 
 1
 Lawrence E. Bathgate, II, borrowed over $19 million from the First National Bank of Toms River, N.J. (the Bank) between 1986 and 1990. These loans were evidenced by the following seven promissory notes:
 
 
 2
 1. a $185,000 promissory note secured by a 1985 Rolls Royce;
 
 
 3
 2. a $1,620,000 promissory note secured by a mortgage on property in Mantoloking, N.J.;
 
 
 4
 3. a $2.0 million promissory note secured by mortgages on two properties located on Buena Vista Drive in Rumson, N.J.;
 
 
 5
 4. a $4.0 million "Line of Credit Master Note" payable on demand and secured by assignments of a $1.6 million note and mortgage executed by Airport Associates and a $6,280,000 note and mortgage executed by Gerald A. Gura;
 
 
 6
 5. a $187,500 promissory note;
 
 
 7
 6. an $11.5 million line of credit secured by
 
 
 8
 (a) second mortgages, security agreements, and assignments of rent on two properties located on Buena Vista Drive in Rumson, N.J.;
 
 
 9
 (b) a second mortgage, security agreement, and assignment of rent on property located in Mantoloking, N.J.;
 
 
 10
 (c) a mortgage, security agreement, and assignment of rent on property located in Howell, N.J., executed by Tuscol Development, Inc.;
 
 
 11
 (d) a mortgage, security agreement, and assignment of rent on a second piece of property in Howell, N.J., executed by Old Monmouth Associates;
 
 
 12
 (e) a collateral assignment of partnership interest on properties located in Freehold, N.J., and Jackson, N.J.;
 
 
 13
 (f) a collateral assignment of partnership interest in Vintage-Pointe Associates;
 
 
 14
 (g) a collateral assignment of a partnership interest in Bedford Village Associates; and
 
 
 15
 (h) a collateral assignment of a partnership interest by Novasau Associates in itself and in NLA Associates; and
 
 
 16
 7. a $250,000 promissory note payable on demand. Federal Deposit Ins. Corp. v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 2-3, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 19-20).
 
 
 17
 In 1989, Bathgate also executed an unconditional guaranty securing 25 percent of a $1.8 million "Agreement for Commercial Letter of Credit" between NLA Associates, LGP-I Limited Partnership, and Novasau Associates and the Bank. Id. at 3 (see Bathgate defendants' App. I at 20).[1] Alan B. Landis secured the remainder of this obligation to the Bank.
 
 
 18
 Bathgate defaulted on the $11,500,000 note by failing to make the required monthly and quarterly payments beginning on October 1, 1990. On February 15, 1991, Bathgate also defaulted on the $187,500 note by failing to make the required monthly payment.
 
 
 19
 On February 26, 1991, the Bank wrote a 13-page letter to Bathgate regarding the $11,500,000 note, the $187,500 note, the $4,000,000 note, the $250,000 note, and the $1,800,000 unconditional guaranty. See Bathgate defendants' App. II at 629. This letter is at the heart of this action. The letter begins by stating that the Bank "has agreed to modify and consolidate" these obligations, and the majority of the letter details the terms and conditions of the modification. Id. The letter was signed by William Carlough, Senior Vice President, and indicated that he sent copies to Douglas Johnson, the Bank's President and CEO, and Charles R. Berman, an attorney at Bourne, Noll & Kenyon. Id. at 642.
 
 
 20
 The following are the most significant provisions of the letter: (1) the "commitment" was subject to Bathgate's "acceptance and return to the Bank, fully executed, by 2/26/91," id. at 641; (2) the "commitment shall expire and shall be of no further effect if the transactions contemplated by this commitment are not closed by 4/1/91," id.; (3) the "bank shall be represented in this transaction by the firm of Bourne, Noll & Kenyon, ... which will prepare all documents in this transaction," id. at 637; and (4) "[t]he Borrower and the Bank shall execute and deliver all documentation required by the Bank in connection with the issuance of the Loan and the Collateral[,]" id. The February letter also identifies specific documents Bathgate was to furnish to the Bank counsel prior to the closing of the transactions contemplated by the letter, id. at 635-37 (see also Bathgate defendants' App. II at 603-05), 639-40,[2] and states that Bathgate must provide "[s]uch other information, documents, certificates, financial statements or opinions reasonably required by the Bank and its counsel," id. at 637.
 
 
 21
 Though Bathgate executed and delivered the February letter to the Bank on February 26, 1991, the proposed restructured loan never was closed. In a letter dated April 11, 1991, the Bank formally demanded payment of two notes on which Bathgate had failed to make payments (the $11,500,000 note and the $187,500 note) and three notes payable on demand (the $4,000,000 note, the $250,000 note, and the $1,800,000 note). Bathgate defendants' App. I at 310.
 
 
 22
 On April 8, 1991, Bathgate failed to make a required payment on the $185,000 note. In a letter dated May 1, 1991, the Bank formally demanded payment of the $185,000 note, and in a second letter dated May 1, 1991, the Bank formally demanded payment of the $1,800,000 note by Bathgate, NLA, and Landis. Bathgate failed to make the payments demanded on these six notes, and NLA and Landis failed to make the payments demanded of them on the $1,800,000 note.
 
 B. Procedural History
 
 23
 On May 3, 1991, the Bank filed two suits in the Superior Court of New Jersey to collect the amounts outstanding under the six notes for which Bathgate had failed to make demanded payments: (1) the $11,500,000 note; (2) the $187,500 note; (3) the $4,000,000 note; (4) the $250,000 note; (5) the $185,000 note; and (6) the $1,800,000 note. In one of the state court actions, the Bank sought judgment against Landis, NLA Associates Limited Partnership, LGP-I Limited Partnership, and LGP-I Capital Corporation (the Landis defendants), and against Bathgate, Novasau Associates, and New Nas, Inc. for the amount outstanding under the $1,800,000 note. In the other state court action, the Bank sought judgment against Bathgate and Novasau Associates for the amounts outstanding under: (1) the $11,500,000 note; (2) the $187,500 note; (3) the $4,000,000 note; (4) the $250,000 note; and (5) the $185,000 note.
 
 
 24
 On May 22, 1991, the Bank was declared insolvent and the FDIC was appointed as the Bank's receiver. The notes in question were sold to an acquiring bank, but then repurchased by the FDIC pursuant to a clause in the Purchase and Assumption Agreement authorizing the acquiring bank to "put" back to the FDIC any adversely classified loans.
 
 
 25
 In June 1991, Bathgate defaulted on the $2,000,000 note and in July 1991, he defaulted on the $1,620,000 note. In a letter dated September 13, 1991, the FDIC informed Bathgate that he had defaulted on these notes and that it had accelerated the maturity of the notes and was demanding full payment of the principal, interest, and other sums outstanding. Bathgate did not make these payments.
 
 
 26
 On June 20, 1991, the FDIC removed the state court actions to the district court, which consolidated them on November 8, 1991. The FDIC was substituted for the Bank as plaintiff. Subsequently, the FDIC filed an amended complaint adding T. Pamela Bathgate, 54 Buena Vista Associates, Tuscol Development, Inc., Old Monmouth Associates, Airport Associates, Gerald A. Gura, the Club at West Deptford, and the State of New Jersey as defendants.
 
 
 27
 In September 1992, the Bathgate defendants (Bathgate, Novasau Associates Limited Partnership, New Nas, Inc., 54 Buena Vista Associates, Tuscol Development, Inc., and Old Monmouth Associates) filed a third-party complaint against the Office of the Comptroller of the Currency (OCC), John McDougal, an OCC employee, and nine directors or officers of the Bank, William Barlow, John C. Fellows, Jr., Ebert L. Hall, Joseph P. Iaria, David E. Johnson, Jr., Irene F. Kramer, Jacqueline F. Pappas, John F. Russo, and Leonard G. Lomell. The district court dismissed the third-party complaint by oral order on March 1, 1993. See Bathgate defendants' App. III at 1007-36 (transcript of proceedings). The Bathgate defendants have not attempted to appeal from this order. However, they did file a motion for leave to file an amended third-party complaint. Subsequently, the Bathgate defendants voluntarily dismissed their third-party complaint against the OCC and McDougal, and the district court denied their motion for leave to amend the remaining third-party claims, holding that their proposed amendments would be futile. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 5, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1041).
 
 
 28
 The Bathgate defendants raised a number of defenses against the FDIC's claims including: (1) setoff and accord and satisfaction; (2) breach of condition; (3) failure to perform a condition precedent; (4) estoppel; (5) cancellation of debt; (6) failure to state a claim upon which relief can be granted; (7) fraud; (8) laches; (9) payment; (10) prevention of performance; and (11) unclean hands. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 10 n. 2, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 27). They also advanced the following counterclaims: (1) breach of contract, and the duty of good faith and fair dealing; (2) violation of the New Jersey Consumer Fraud Act; (3) trade libel/slander of credit; (4) slander of title; (5) unlawful interference with prospective economic advantage; (6) malicious and egregious breach of contract; (7) abuse of process; and (8) fraud and negligent misrepresentation. Id. at 10-11 n. 2 (see Bathgate defendants' App. I at 27-28).
 
 
 29
 On March 18, 1993, the district court granted summary judgment in favor of the FDIC both on its claims against the Bathgate defendants and on the Bathgate defendants' claims against it. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 18-35). The district court held that the D'Oench Duhme doctrine and 12 U.S.C. Sec. 1823(e) barred the defenses raised by the Bathgate defendants because they were based on an alleged oral agreement to extend the April 1 closing date for the transactions contemplated in the Bank's February letter to Bathgate. Id. at 12-17 (see Bathgate defendants' App. I at 29-34). The district court also held that D'Oench Duhme and section 1823(e) barred the majority of the counterclaims raised by the Bathgate defendants. Id. at 16-17 (see Bathgate defendants' App. I at 33-34).
 
 
 30
 With regard to the Bathgate defendants' claims that the default letters, legal complaints and certain statements to the media allegedly issued by the Bank constitute libel and slander, the district court held: (1) that the default letters did not contain false statements since the closing date in the February letter had passed and thus Bathgate was actually in default; (2) that the Bank's legal complaints were privileged from slander and defamation actions; and (3) that the Bathgate defendants "failed to designate specific facts that raise a material issue for trial regarding ... [the Bank's] alleged republishing of the default letters and complaints to the press." Id. at 16 (see Bathgate defendants' App. I at 33). Finally, with regard to the counterclaim for tortious interference, the district court held that the Bathgate defendants "failed to raise an adequate response to the FDIC's argument that the claim is barred under the D'Oench, Duhme doctrine and Sec. 1823(e)." Id.[3]
 
 
 31
 On May 10, 1993, the district court denied Bathgate's motion for reconsideration of its March 18, 1993 order. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order (D.N.J. May 10, 1993) (see Bathgate defendants' App. I at 39-41). The Bathgate defendants then filed a notice of appeal from this order denying their motion for reconsideration. This appeal (Bathgate I) was docketed at No. 93-5328. Bathgate I was submitted to a panel of this court for possible dismissal on jurisdictional grounds on August 16, 1993.
 
 
 32
 Meanwhile, on August 5, 1993, the district court entered an order and final judgment of foreclosure, FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Order and Final Judgment of Foreclosure and on Contract in Favor of Plaintiff (D.N.J. Aug. 5, 1993) (see third-party defendants' Supp.App. at 16-36), and on August 18, 1993, the Bathgate defendants filed a second appeal. This second appeal (Bathgate II) was docketed at No. 93-5507.[4]
 
 
 33
 By order entered October 6, 1993, we dismissed Bathgate I (No. 93-5328) for lack of jurisdiction because the district court's order was not "final" as to all claims and all parties and the district court had not granted a Fed.R.Civ.P. 54(b) certification. Subsequently, the district court granted Rule 54(b) certification, and on October 14, 1993, the Bathgate defendants filed a motion for reconsideration of the order dismissing Bathgate I (No. 93-5328) and for consolidation of Bathgate I (No. 93-5328) with Bathgate II (No. 93-5507). By order entered November 8, 1993, we granted the motion for reconsideration, reinstated Bathgate I, and consolidated Bathgate I and Bathgate II. The briefs filed in Bathgate II (No. 93-5507) address all the issues raised in the Bathgate I briefs (No. 93-5328), as well as the district court's denial of the Bathgate defendants' motion for leave to amend their third-party complaint. See Bathgate defendants' Br. at 6 n. 4.
 
 
 34
 Thus, in this consolidated appeal, the Bathgate defendants are challenging both the district court's order granting summary judgment to the FDIC, FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 18-35), and the district court's order denying their motion for leave to amend their third-party complaint, FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 5, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1044). We rely primarily on the Bathgate II briefs, as they address both issues.
 
 II. DISCUSSION
 
 35
 The district court exercised subject matter jurisdiction over the FDIC's claims against the Bathgate defendants and the Bathgate defendants' claims against the FDIC pursuant to 12 U.S.C. Sec. 1819(b). Although the district court granted summary judgment in favor of the FDIC, both on its claims against the Bathgate defendants and Bathgate's claims against it, the court denied without prejudice the FDIC's motion for summary judgment against the Landis defendants based on a forbearance agreement between the FDIC and these defendants. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 17, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 34). Thus, a jurisdictional issue was created, as the district court proceedings were not final as to all parties and issues.
 
 
 36
 However, the district court granted a certification under Rule 54(b) which provides in pertinent part: "When more than one claim for relief is presented in an action, ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." We exercise plenary review over a district court's determination that a judgment is final, and then determine whether a district court has abused its discretion in deciding that a judgment is " 'ready for appeal.' " Gerardi v. Pelullo, 16 F.3d 1363, 1368 (3d Cir.1994) (quoting Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980)). In this case, the district court granted the Rule 54(b) certification after making the required finding "that there is no just reason for delay" and directing the entry of judgment. We concur in the district court's determination that the judgment was final and "ready for appeal." Thus, we have jurisdiction over the Bathgate defendants' appeal pursuant to 28 U.S.C. Sec. 1291.[5]
 
 
 37
 We exercise plenary review over the district court's grant of summary judgment in favor of the FDIC. See Petruzzi's IGA v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); Wheeler by Wheeler v. Towanda Area School Dist., 950 F.2d 128, 129 (3d Cir.1991); American Medical Imaging Corp. v. St. Paul Fire and Marine Ins. Co., 949 F.2d 690, 692 (3d Cir.1991). Thus, we apply the same standard applied by the district court. Petruzzi's IGA, 998 F.2d at 1230. This standard entitles a movant to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 38
 [T]he moving party has the initial burden of identifying the evidence that demonstrates the absence of a genuine issue of material fact, [but] the respondent (the "non-movant") must establish the existence of each element on which it bears the burden of proof.
 
 
 39
 J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Moreover, "[w]here the movant has produced evidence in support of its motion for summary judgment, the nonmovant cannot rest on the allegations of pleadings and must do more than create some metaphysical doubt." Petruzzi's IGA, 998 F.2d at 1230. Finally, in applying this standard, "all inferences must be drawn against the movant, ... and in favor of the nonmovant." Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988).
 
 A. The FDIC's Claims Against Bathgate
 
 40
 The Bathgate defendants argue that there is a material dispute of fact regarding whether they were in "default" on the notes at issue.[6] They contend that the district court erred in granting summary judgment to the FDIC because they provided the district court with evidence contradicting its finding that " 'since the closing date in the February commitment had lapsed, the Bathgate Defendants were in default.' " See Bathgate defendants' Br. at 16 (quoting FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 16, 1993 WL 661958 (D.N.J. Mar. 18, 1993)). They refer to the February letter the Bank issued to Bathgate as an agreement which "consolidated any past payments" which were due on the notes, see Bathgate defendants' Br. at 11, and argue that the Bank breached this agreement by failing to provide completed documents to Bathgate by April 1, 1991 "even though all required information was either in the Bank's possession or would have been provided to the Bank, if requested," id. at 16. Thus, they argue that they were not in default as of April 1, 1991, and that "[a]ny failure subsequent to April 1 to make payments on Bathgate's obligations resulted from the Bank's prior breach and the devastating affect [sic] this breach had on his ability to pay," id. at 12. However, as we noted above, the district court held that the D'Oench Duhme doctrine and 12 U.S.C. Sec. 1823(e) barred the defenses raised by the Bathgate defendants in support of this theory. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 12-17, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 29-34).
 
 
 41
 1. Are the Bathgate defendants' defenses barred by the D'Oench Duhme Doctrine and section 1823(e)?
 
 
 42
 (a) Defense of Breach of Agreement
 
 
 43
 The Bathgate defendants argue that the FDIC is not entitled to recover under the notes and the guaranty acquired from the Bank because the Bank breached the agreement embodied in its February letter to Bathgate. The district court held that D'Oench Duhme and section 1823(e) barred the Bathgate defendants' defense of breach of agreement because the Bathgate defendants were "attempting to enforce an oral agreement to extend a closing date on a proposed loan restructuring." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 12, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 29). The Bathgate defendants state that "[c]ontrary to the Opinion [of the district court], the Bathgate Defendants are not attempting to enforce the Bank's oral extension of the Agreement.... Rather, the Bathgate Defendants are attempting to enforce the alleged written agreement which the Bank breached by not preparing closing documents and attending closing by the April 1, 1991 deadline" as required by the February letter. See Bathgate defendants' Br. at 18-19 (citing FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 11, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (emphasis in original)). While they claim that the Bank orally extended the closing date for the transactions contemplated in the February letter, they contend that their argument does not rest on this allegation. Accordingly, they maintain that D'Oench Duhme does not bar their defense of breach of agreement since the February letter was neither oral nor secret. Id. at 18-20.
 
 
 44
 In D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 460-62, 62 S.Ct. 676, 680-81, 86 L.Ed. 956 (1942), the Supreme Court held that in an action brought by the FDIC to collect on a note acquired from a bank, the debtor or maker of the note may not raise a secret agreement as a defense to the FDIC's enforcement of the note. The court based its holding on provisions of the Federal Reserve Act which "reveal[ed] a federal policy to protect [the FDIC] ... and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] ... insures or to which it makes loans." Id. at 457, 62 S.Ct. at 679. The Supreme Court reasoned that this policy barred any defense based on "a scheme or arrangement whereby the banking authority on which ... [the FDIC] relied in insuring the bank was or was likely to be misled." Id. at 460, 62 S.Ct. at 681. Thus, "[t]he rule emerging from D'Oench Duhme is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC." Adams v. Madison Realty & Dev., Inc., 937 F.2d 845, 852 (3d Cir.1991). As we stated in RTC v. Daddona,
 
 
 45
 '[f]undamentally, D'Oench attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities.'
 
 
 46
 RTC v. Daddona, 9 F.3d 312, 319 (3d Cir.1993) (quoting Bowen v. FDIC, 915 F.2d 1013, 1016 (5th Cir.1990)). Based on the purpose of the doctrine, we have held that "not only does the existence of the agreement have to appear plainly on the face of an obligation, but the basic structure of that agreement--its essential terms--must also appear plainly on the face of that obligation." Id. at 319.
 
 
 47
 The holding in D'Oench Duhme "essentially" was codified by the Federal Deposit Insurance Act of 1950. Id. at 316. See also Carteret Sav. Bank, P.A. v. Compton, Luther & Sons, Inc., 899 F.2d 340, 343 (4th Cir.1990). The Act provides that:
 
 
 48
 No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or under section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement--
 
 
 49
 (1) is in writing,(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 
 
 50
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 
 
 51
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
 
 
 52
 12 U.S.C. Sec. 1823(e). Congress intended section 1823(e) "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets," to "ensure mature consideration of unusual loan transactions by senior bank officials, and [to] prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Langley v. FDIC, 484 U.S. 86, 91-92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).[7]
 
 
 53
 Clearly the district court was correct in holding that D'Oench Duhme and section 1823(e) barred any defense based on the Bathgate defendants' contention that they reached an oral agreement with the Bank to extend the April 1 closing date identified in the February letter. Thus, the real question is whether in light of the D'Oench Duhme doctrine and the requirements of section 1823(e), the alleged agreement embodied in the February letter can "diminish or defeat" the FDIC's rights under the promissory notes acquired from the Bank. The Bathgate defendants argue that the agreement embodied in the February letter can "diminish or defeat" the FDIC's rights under the promissory notes acquired from the Bank because it is in writing.
 
 
 54
 Their position that the contents of the February letter can diminish or defeat the FDIC's rights under facially unqualified promissory notes must rest on one of two constructions of the February letter. One construction they seem to advance is that once Bathgate signed the Bank's February letter and returned it to the Bank in a timely fashion, the Bank's preparation of the documents required to close the proposed loan consolidating five of Bathgate's preexisting notes became a condition to the performance of the Bathgate defendants' obligations under these preexisting notes. Alternatively, the Bathgate defendants' position must rest on the argument that once Bathgate signed the Bank's February letter and returned it to the Bank in a timely fashion, the letter obligated the Bank to close and execute the proposed loan. But neither of these arguments survives the D'Oench Duhme doctrine or section 1823(e) because the February letter does not create a genuine issue of material fact as to the existence of a written agreement providing (1) that the Bank's preparation of the documents required to close the proposed loan was a condition to the performance of the Bathgate defendants' obligations under the preexisting notes or (2) that the Bank was obligated to close and execute the proposed loan consolidating Bathgate's obligations under five of the preexisting notes.
 
 
 55
 The Supreme Court in Langley held that in light of section 1823(e)'s intended functions and of the broad language used in D'Oench Duhme, the term "agreement" in section 1823(e) should be construed to cover not only a party's promises to perform acts, but also conditions to the performance of a party's obligations. Langley, 484 U.S. at 90-93, 108 S.Ct. at 401-02. Thus, the Act requires that both promises and conditions be in writing. Moreover, as we noted above, "the purpose of section 1823(e), and by implication the D'Oench, Duhme doctrine, is to allow the FDIC to rely on bank records both when insuring the bank and when taking over a failed bank." FSLIC v. Two Rivers Assocs., Inc., 880 F.2d 1267, 1275 (11th Cir.1989) (citing Langley, 484 U.S. at 91-92, 108 S.Ct. at 401). Thus, the focus of our inquiry must be whether the February letter put the FDIC on notice: (1) that the Bank's preparation of the documents required to close the proposed loan was a condition to the performance of the Bathgate defendants' obligations under the preexisting notes or (2) that the Bank was obligated to close and execute the proposed loan consolidating Bathgate's obligations under five of the preexisting notes.
 
 
 56
 Although the February letter contains the Bank's written promise to prepare certain documents required to close the proposed loan, it does not contain any language suggesting that the performance of this promise is a condition to Bathgate's performance of his obligations on the preexisting notes. Thus, it does not put the FDIC on notice that Bathgate's obligations under the otherwise unqualified preexisting notes were conditioned on the Bank's preparation of the documents required to close the proposed loan. Indeed, we cannot conceive that the Bank would have entered into an agreement which would discharge many millions in loans if the subsequent loan was not closed.
 
 
 57
 Similarly, although the February letter expresses the Bank's intent to "modify and consolidate" five of Bathgate's preexisting notes, it does not obligate the Bank to do so. See Bathgate defendants' App. II at 629. The February letter stated that the Bank had "agreed to modify and consolidate" five of Bathgate's preexisting notes, id., and was signed by the Bank's Senior Vice President, William Carlough, id. at 642. Moreover, after receiving the letter, Bathgate signed it and returned it to the Bank by February 26, 1991, as required by the terms of the letter. Id. at 641-42. However, the letter expressly stated that the Bank's "commitment shall expire and shall be of no further effect if the transactions contemplated by th[e] commitment are not closed by 4/1/91." Id. at 641. The Bank sent a draft agreement for the proposed loan to Bathgate on March 22, 1991, via Federal Express. Id. at 649. This draft agreement and the accompanying promissory note were incomplete and never were signed by Bathgate or a representative of the Bank. Id. at 649-85. Furthermore, the draft agreement explicitly stated that "[t]he Bank shall not be obligated to make the Loan hereunder unless all legal matters incident to the transactions hereby contemplated shall be satisfactory to the Bank and its counsel, and it shall have received properly executed, as of the closing date, and in a form it deems satisfactory," the agreement, the attached promissory note, and other enumerated documents. Id. at 661-64.
 
 
 58
 Since neither the draft loan agreement nor the attached promissory note was completed or signed, the proposed loan never was closed, and the February letter expired by its own terms on April 1, 1991. It is clear that neither the February letter, nor the draft agreement and promissory note could have put the FDIC on notice: (1) that the February letter made Bathgate's obligations under the otherwise unqualified preexisting notes conditional on the Bank's preparation of the documents required to close the proposed loan or (2) that once Bathgate signed the Bank's February letter and returned it to the Bank in a timely fashion, the Bank was obligated to close and execute the proposed loan. As the FDIC notes in its brief, "Bathgate's breach of contract claims and his defenses to his obligations primarily rest on three unrecorded conditions to otherwise facially unqualified instruments: (1) that the terms of the February Commitment Letter continued to bind the Bank after April 1, 1991, despite the Letter's express terms to the contrary; (2) that the Letter cured his October 1990 default on the 11,500,000 Note;" and (3) that the February commitment letter covered not only the five preexisting notes which the Bank proposed to consolidate, but also "the $185,000 Note, the $1,620,000 Note, and the $2,000,000 Note ... despite the lack of a writing purporting to link these Notes to the Letter." See FDIC Br. at 15.
 
 
 59
 Thus, we hold that D'Oench Duhme and section 1823(e) bar the Bathgate defendants' defense of breach of agreement. Our holding is consistent with the holdings in RTC v. Daddona, 9 F.3d 312; FSLIC v. Two Rivers Assocs., Inc., 880 F.2d 1267; FSLIC v. Gemini Management, 921 F.2d 241 (9th Cir.1990); and FDIC v. O'Neil, 809 F.2d 350 (7th Cir.1987).
 
 
 60
 Daddona involved a suit brought by the RTC against real estate developers to recover on a $2,230,000 loan for the acquisition of an industrial park. Daddona, 9 F.3d at 314-15. The RTC had acquired the loan from a savings and loan. Id. The defendant real estate developers claimed that the savings and loan had breached a written agreement to provide them an additional loan of at least $9,000,000 for improvement and development of the industrial park. Id. In support of their argument, the defendants pointed to "several writings that refer[red] to the $2,230,000 loan as an initial loan and refer[red] to purposes other than the acquisition of property." Id. at 316. We held that "an agreement is only 'in writing' if its basic structure is apparent on the face of the writing," id. at 314, and concluded that the alleged agreement to extend an additional loan did not survive the requirements of D'Oench Duhme and section 1823(e) because the writings "provide[d] no terms of the alleged agreement whatsoever," id. at 317. The "evidence establishe[d] no more than that the parties contemplated future loans, not that they had agreed to them." Id.
 
 
 61
 In this case, the February letter establishes that the Bank contemplated a future loan to Bathgate on certain terms. However, it is not "apparent on the face of the writing" that once Bathgate signed the Bank's February letter and returned it to the Bank in a timely fashion, the Bank's preparation of the documents required to close the proposed loan would become a condition to the performance of the Bathgate defendants' obligations under the preexisting notes, nor is it "apparent on the face of the writing" that once the Bank's February letter was signed by Bathgate and returned to the Bank in a timely fashion, the Bank would become obligated to close and execute the proposed loan consolidating Bathgate's obligations under five of the preexisting notes. What is "apparent on the face of the writing" is that the commitment embodied in the February letter would expire on April 1, 1991, if the transactions contemplated in the letter were not closed by that time. Thus, our holding in Daddona supports our conclusion that D'Oench Duhme and section 1823(e) bar the Bathgate defendants' defense of breach of agreement.
 
 
 62
 Two Rivers Assocs. involved a suit by the FSLIC to recover on several notes acquired from a savings and loan and to foreclose on the mortgages securing these notes. Two Rivers Assocs., 880 F.2d at 1268-69. The defendant in Two Rivers Assocs., like the defendant in Daddona, claimed that the savings and loan had breached an agreement to provide it with additional funds. Id. at 1275. According to the defendant, the savings and loan agreed to fund an entire development project, but refused to advance further funds after funding only part of the project. Id. The Court of Appeals for the Eleventh Circuit held that the defendant was barred from asserting a defense based on the breach of an agreement to fund the entire development project because the written provisions in the loan agreements "at most reflect[ed] that [the savings and loan] ... intended to loan additional funds, [and] ... fell far short of establishing that [the savings and loan] ... was obligated to fund the entire project." Id. at 1276. "At no point in the many different documents evidencing the loans at issue ... [was] there an explicit acceptance of the obligation to fund the entire project." Id. Thus, D'Oench Duhme barred the defendant's defense of breach of agreement because the FSLIC was not "put on notice of any agreement that ... [the savings and loan] was obligated to fund the entire project." Id.[8] Similarly, in this case, D'Oench Duhme bars the Bathgate defendants' defense of breach of agreement because the February letter did not put the FDIC on notice that once Bathgate signed the Bank's February letter and returned it to the Bank in a timely fashion, the Bank's preparation of the documents required to close the proposed loan would become a condition to the performance of the Bathgate defendants' obligations under the preexisting notes or that the Bank would become obligated to close and execute the proposed loan.
 
 
 63
 In FSLIC v. Gemini Management, 921 F.2d 241, the FSLIC sought to recover on a loan of $1,100,000 acquired from a savings and loan. The defendant asserted affirmative defenses and counterclaims based on the savings and loan's alleged agreement to extend it a larger loan of $1,545,000. Id. at 243-45. In support of its claims, the defendant pointed to an initial commitment letter, stating that the savings and loan agreed to loan the defendant $1,545,000. Id. This initial commitment letter "was unsigned, was not evidenced by a promissory note, and therefore expired by its own terms on August 20, 1984." Id. at 245. In contrast, a second commitment letter providing for a loan of $1,100,000 "was signed and supported by full loan documentation." Id.
 
 
 64
 The Court of Appeals for the Ninth Circuit held that "D'Oench and its progeny require a clear and explicit written obligation." Thus, although D'Oench Duhme does not bar " 'defenses based on a bilateral obligation which appears in the bank's records,' " id. (quoting Two Rivers, 880 F.2d at 1275) (emphasis added in Gemini Management ), the court held that D'Oench Duhme barred the defenses and counterclaims based on the savings and loan's alleged agreement to extend a larger loan of $1,545,000. The court based its holding on the conclusion that the initial commitment letter fell short of "establishing that ... [the savings and loan] was obligated " to extend the larger loan, although it established the savings and loan's intent to do so. 921 F.2d at 245. Gemini Management is persuasive precedent because the February letter, like the initial commitment letter in Gemini Management, was not evidenced by a promissory note, and the draft loan agreement subsequently prepared by the Bank never was signed. Thus, the February letter and the draft loan agreement fall short of establishing the type of written bilateral obligation required by Gemini Management to survive D'Oench Duhme.
 
 
 65
 Finally, the decision by the Court of Appeals for the Seventh Circuit in FDIC v. O'Neil, 809 F.2d 350, also supports our holding. The defendants in O'Neil borrowed $1,000,000 from a bank. O'Neil, 809 F.2d at 352. The FDIC subsequently purchased the defendants' $1,000,000 note, and then sought to collect on it. Id. The defendants claimed that when the bank extended the $1,000,000 loan, it and two other banks agreed to support the defendants' bid to purchase a bankrupt hospital. Id. According to the defendants, the banks breached this agreement by supporting a rival bidder, and the defendants were entitled to retain the $1,000,000 as a setoff to their damages against the banks. Id. The principal writing supporting the defendants' argument was a draft agreement which never had been executed, but which was referenced in the $1,000,000 promissory note. The Court of Appeals held that the unexecuted draft agreement did not satisfy the "demanding requirements of section 1823(e)" because it "was never executed by the parties to it, was not approved by the bank's board or loan committee, was not noted in the bank's minutes, and was not an official or for that matter any other sort of bank record." Id. at 353-54.
 
 
 66
 In this case, although the Bank's Senior Credit and Policy Committee and the Bank's Executive Committee approved the "proposal" contained in the February letter, and their decisions were noted in their minutes, see Bathgate defendants' App. II at 646, 648, the letter was merely an offer which was contingent on a number of events and expired on April 1, 1991. By the terms of the offer, Bathgate could not transform the offer into an unconditional agreement merely by signing and returning it by February 26. In fact, the Bank prepared a draft agreement and promissory note which, like the draft agreement in O'Neil, never were executed and therefore never became official bank records. Thus, we reiterate that in light of D'Oench Duhme and the requirements of section 1823(e), the February letter cannot support the Bathgate defendants' claims that once Bathgate signed the Bank's February letter and returned it to the Bank in a timely fashion, the Bank's preparation of the documents required to close the proposed loan became a condition to the performance of the Bathgate defendants' obligations under the preexisting notes. Furthermore, the February letter cannot support the Bathgate defendants' claim that the Bank became obligated to close and execute the proposed loan consolidating Bathgate's obligations under five of the preexisting notes.
 
 
 67
 Moreover, it is questionable whether any agreement reflected in the February letter would satisfy the contemporaneity requirement of section 1823(e), since the Bank issued the February letter after Bathgate executed the notes involved in this case. See 12 U.S.C. Sec. 1823(e)(2); FDIC v. Virginia Crossings Partnership, 909 F.2d 306, 309 (8th Cir.1990) (held that memoranda prepared many months before execution of loans did not satisfy section 1823(e)'s contemporaneity requirement); FDIC v. Manatt, 922 F.2d 486, 489 (8th Cir.) (concurring opinion) ("I concur with the result the court reaches and write separately only to express my view that the district court did not err in holding that the contemporaneous requirement of 12 U.S.C. Sec. 1823(e)(2) was not met, and that Manatt has not established accord and satisfaction as an affirmative defense."), cert. denied, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991); Carteret Sav. Bank, P.A. v. Compton, Luther & Sons, 899 F.2d at 344 ("Title 12 U.S.C.A. Sec. 1823 clearly requires that the collateral agreement must be contemporaneous [with the execution of a note] if it is to be enforceable."). But see Resolution Trust Corp. v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1500-01 (9th Cir.1993) (holding that loan commitment letter executed more than two months prior to the final loan documents satisfied contemporaneity requirement of section 1823(e)(2) because "it takes several months to put together" large loans and satisfaction of the requirement "should be considered in light of commercial reality."); FDIC v. Manatt, 922 F.2d at 489 n. 4 ("We doubt that Congress intended that section 1823(e)(2)'s contemporaneousness requirement would defeat a valid accord and satisfaction entered into by a bank. Valid accord and satisfaction agreements are never contemporaneously executed with the initial documents incurring the debt--the idea that they would be so executed is simply contrary to general business practice and to common sense. Surely Congress did not mean to preclude banks from getting something of value by an accord and satisfaction rather than nothing at all."). However, since we hold that the conditions on which the Bathgate defendants rely were not part of the February letter and thus were not in writing as required by 12 U.S.C. Sec. 1823(e)(1), we need not reach a definitive conclusion as to the applicability of the contemporaneity requirement of 12 U.S.C. Sec. 1823(e)(2) in this case.
 
 
 68
 In support of their argument that the February letter satisfies the requirements of D'Oench Duhme and section 1823(e), the Bathgate defendants cite Agri Export Co-op v. Universal Sav. Ass'n, 767 F.Supp. 824, 832 (S.D.Tex.1991), and other cases holding that D'Oench Duhme and section 1823(e) do not bar certain defenses. However, these cases are distinguishable.
 
 
 69
 In Agri Export Co-op, the plaintiffs sought to enforce a letter of credit issued by a savings association. Agri Export Co-op, 767 F.Supp. at 826-27. As receiver for the savings association, the RTC denied liability on the letter of credit, arguing that D'Oench Duhme and section 1823(e) barred recovery by the plaintiffs since the savings association's directors did not approve the letter of credit and it was not recorded properly in the savings association's records. Id. at 827. The court held that the D'Oench Duhme doctrine did not apply to the letter of credit because it was a "straight-forward obligation of the bank," not a "side agreement ... inextricably entwined with a loan or other asset of the financial institution" or an agreement "intended to deceive, ... [or] likely to deceive banking authorities." Id. at 832. Moreover, the court held that "[e]ven if the D'Oench doctrine could somehow be applicable to a letter of credit issued by a failed savings institution and its execution could somehow be characterized as a 'secret' or 'side' agreement, the 'completely innocent' exception to D'Oench articulated in Federal Deposit Ins. Corp. v. Meo, 505 F.2d 790, 793 (9th Cir.1974) would be appropriate in this case ... [because] [o]ne would hardly expect a bank customer to do more than the ... [plaintiff] did to assure that the letter of credit issued by Universal was valid." Id.
 
 
 70
 This case is distinguishable from Agri Export Co-op on multiple grounds. First, the February letter is a "side agreement ... inextricably entwined" with preexisting Bank assets. Moreover, although the February letter may not have been intended to deceive banking authorities, because the letter had expired and the proposed loan consolidating certain preexisting notes never had been closed, the letter would not have put banking authorities on notice that any of Bathgate's preexisting notes were no longer enforceable as written. Even if we were to recognize a "completely innocent" exception to D'Oench Duhme, Bathgate would not fall under it. Bathgate could have done more to assure that the February letter or other writings clearly indicated that once he signed and timely returned the Bank's February letter, the Bank's preparation of the documents required to close the proposed loan became a condition to the performance of his obligations under the preexisting notes (in the unlikely circumstance that this was the parties' understanding) or, alternatively, that the Bank became obligated to close and execute the proposed loan consolidating his obligations under five of the preexisting notes. At a minimum, he could have delivered to the Bank the documents which the February letter required him to supply and which clearly could not be prepared by Bank counsel. See footnote 2, supra. As the court in FDIC v. Hamilton, 939 F.2d 1225, 1230 (5th Cir.1991), stated, one "justification for applying D'Oench, Duhme to oral agreements or collateral writings is that the obligor as party to the transaction is in a better position to protect himself than the FDIC." See also FDIC v. First Nat'l Fin. Co., 587 F.2d 1009, 1012 (9th Cir.1978) (holding that Meo is distinguishable because in Meo, "[t]here was simply a failure of consideration of which the promisor was unaware until after the bank was closed and the suit was filed by the FDIC," whereas in this case there was no failure of consideration).
 
 
 71
 The Agri Export Co-op court also held that section 1823(e) did not apply to the letter of credit because the savings association did not "acquire a particular, identifiable asset" in exchange for the letter of credit, and therefore the RTC had "no 'right, title or interest' in an asset that claims and defenses could 'diminish or defeat'." 767 F.Supp. at 833-34. Thus, this case is also distinguishable from Agri Export Co-op because the FDIC has an interest in the preexisting notes on which the Bathgate defendants defaulted, and the Bathgate defendants' claims and defenses, if successful, would "diminish or defeat" the FDIC's interest in these assets.
 
 
 72
 Other cases cited by the Bathgate defendants are also distinguishable. For example, in Howell v. Continental Credit Corp., 655 F.2d 743, 744-45 (7th Cir.1981), the FDIC sought to enforce leases which it had acquired from an insolvent bank. The leases provided that a lessor which assigned its rights to the bank would lease certain equipment to a corporation. Id. The corporation claimed that the leases were invalid because the lessor never had purchased the required equipment, but the district court held that the corporation's claim was barred by D'Oench Duhme and section 1823(e). The Court of Appeals for the Seventh Circuit reversed, holding that D'Oench Duhme and section 1823(e) were inapplicable because the leases that the FDIC sought to enforce "facially manifest[ed] bilateral obligations and serve[d] as the basis of the lessee's defense." As the Howell court stated,
 
 
 73
 'when ... the asset upon which the FDIC is attempting to recover is the very same agreement that the makers allege has been breached by the FDIC's assignors, ... [n]one of the policies that favor the invocation of ... [Sec. 1823(e) ] are present ... because the terms of the agreement that tend to diminish the rights of the FDIC appear in writing on the face of the agreement that the FDIC seeks to enforce.'
 
 
 74
 655 F.2d at 747 (quoting Riverside Park Realty Co. v. FDIC, 465 F.Supp. 305, 313 (M.D.Tenn.1978)). Like the court in Howell, the court in FDIC v. Laguarta, 939 F.2d 1231, 1238-39 (5th Cir.1991), held that D'Oench Duhme does not bar an affirmative defense based on "funding obligations ... spelled out" in the loan agreement underlying the note which the FDIC is seeking to enforce. See also FDIC v. Merchants Nat'l Bank of Mobile, 725 F.2d 634, 639 (11th Cir.) ("Section 1823(e) does not apply ... when the court determines if an asset is invalid ... for breach of bilateral obligations contained in the asset.... In such cases the parties contend that no asset exists or an asset is invalid and that such invalidity is caused by acts independent of any understanding or side agreement.") (citations omitted), cert. denied, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984).
 
 
 75
 In this case, however, the FDIC is attempting to enforce facially valid promissory notes which impose unilateral obligations on Bathgate to pay certain sums to the Bank, and neither these notes nor the loan agreements supporting them are the basis of the Bathgate defendants' defense of breach of agreement. Instead, their defense is based on a separate document, the February letter, which they claim is a separate agreement. The court in O'Neil distinguished Howell on this basis, stating that it was "hard to quarrel" with the result in Howell because it involved a lease not a promissory note, the lease "was explicit about the lessor's obligation," and "there was no side agreement." O'Neil, 809 F.2d at 354.[9] Thus, this case is distinguishable from Agri Export Co-op, Howell, and other cases holding that defenses based on writings containing bilateral obligations are not barred by D'Oench Duhme or section 1823(e).
 
 
 76
 We will affirm the district court's holding that D'Oench Duhme and section 1823(e) bar the Bathgate defendants' defense of breach of agreement. The district court also held that the Bathgate defendants' claim that the February letter constituted an accord and satisfaction was barred because "the transactions contemplated in the February Commitment did not close before April 1, 1991, and there is no evidence of an agreement which satisfies Sec. 1823(e) and extends the closing date." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 15, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 32). Based on the forgoing analysis, we also will affirm this holding.
 
 
 77
 (b) Defenses of breach of the duty of good faith, wrongful acceleration, and other defenses sounding in tort
 
 
 78
 The Bathgate defendants raised a number of defenses "which sound in tort, including breach of the duty of good faith; violation of the Consumer Fraud Act, [N.J.Stat.Ann. Sec. 56:8-1 (West 1989) ] et seq.; trade libel/slander of credit; slander of title; unlawful interference with prospective economic advantage; and malicious and egregious breach of the Bank's duty to protect the Collateral pledged to secure the Bathgate Loans." See Bathgate defendants' Br. at 20 n. 11.
 
 
 79
 The district court held that the D'Oench Duhme doctrine and section 1823(e) barred the defenses of the duty of good faith and wrongful acceleration, because they could not be separated from the Bathgate defendants' allegations that the Bank breached an oral agreement since "[a]bsent the alleged oral agreement, ... [the Bank] was entitled to demand payment on the overdue loans." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 13, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 30). The district court also refused to consider the defense of impairment of collateral and other defenses based on the FDIC's tortious conduct because they were "similarly predicated on the alleged oral agreement." Id. at 14 (see Bathgate defendants' App. I at 31).
 
 
 80
 As the FDIC points out in its brief, see FDIC Br. at 24 n. 15, D'Oench Duhme bars a defense or claim sounding in tort when the alleged tort arises from an unrecorded agreement. See, e.g., In re Columbus Ave. Realty Trust, 968 F.2d 1332, 1344-45 (1st Cir.1992); Oliver v. RTC, 955 F.2d 583, 586 (8th Cir.1992); Timberland Design, Inc. v. First Serv. Bank for Sav., 932 F.2d 46, 50 (1st Cir.1991). The Bathgate defendants claim that D'Oench Duhme does not bar the defense of the duty of good faith, the defense of wrongful acceleration, or other defenses based on the Bank's allegedly tortious conduct because "[c]ontrary to the Opinion [of the district court], these claims are not 'inextricably linked to the alleged oral agreement.' " See Bathgate defendants' Br. at 20 (quoting FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 13, 1993 WL 661958 (D.N.J. Mar. 18, 1993)). We disagree with the Bathgate defendants' position, and thus conclude that the Bathgate defendants are barred from raising the defenses of the duty of good faith, wrongful acceleration, and impairment of collateral, as well as other defenses based on the Bank's tortious conduct.
 
 
 81
 In support of their argument that the wrongful acceleration and breach of the duty of good faith defenses are not barred, the Bathgate defendants cite Texas Refrigeration Supply, Inc. v. FDIC, 953 F.2d 975 (5th Cir.1992). See Bathgate defendants' Br. at 21, 29. The court in Texas Refrigeration held that the district court erred in granting summary judgment against the obligors on their claim of wrongful acceleration because there were genuine issues of material fact regarding whether the note had been accelerated and if so, whether it was accelerated in bad faith. Id. at 981-82. However, the court noted that the obligor's claim of wrongful acceleration would be "ineffective against the FDIC" if it was based on an oral agreement providing that the lender would not accelerate the obligor's note. Id. at 982 n. 13.
 
 
 82
 In this case, the Bank informed Bathgate by a letter dated April 11, 1991, that he was in default under two notes, the $11,500,000 note and the $187,500 note, and that as a result, the Bank was accelerating the maturity on these notes. See Bathgate defendants' App. I at 309-10. At the same time, the Bank demanded payment on three notes which were payable "on demand," the $4,000,000 note, the $250,000 note, and the $1,800,000 note. Id. at 310. Subsequently, the Bank demanded payment on the $185,000 note which already had matured, id. at 315-16, and accelerated the maturity of two additional notes on which Bathgate defaulted in the summer of 1991, the $2,000,000 note and the $1,620,000 note.
 
 
 83
 The Bathgate defendants point to the minutes of the April 10, 1991 meeting of the Bank's Board of Directors as evidence of the Bank's bad faith. See Bathgate defendants' App. II at 734-37. However, even drawing all inferences in favor of the Bathgate defendants, we conclude that the minutes of the Board meeting fail to establish a genuine issue of material fact regarding whether the Bank's decision to accelerate Bathgate's obligations was made in good faith. Thus, having held that D'Oench Duhme bars defenses based on any of the following: (1) an alleged oral agreement extending the April deadline in the February letter; (2) the claim that the Bank's preparation of the closing documents for the loan proposed in the February letter became a condition to the performance of Bathgate's obligations under the preexisting notes; or (3) the claim that the Bank became obligated to close the loan proposed in the February letter, we conclude that there is no genuine issue of material fact regarding whether the Bank's decision to accelerate Bathgate's obligations was made in good faith.
 
 
 84
 In support of their claim that the defense of impairment of collateral is not barred, the Bathgate defendants cite FDIC v. Blue Rock Shopping Center, Inc., 766 F.2d 744 (3d Cir.1985). See Bathgate defendants' Br. at 23, 30. In Blue Rock, we held that "a co-maker who signs a note to accommodate the primary obligor and who has the right of recourse against the primary obligor is a surety who can assert the defense [of unjustifiable impairment of collateral]" codified in section 3-606(1) of the Uniform Commercial Code. Blue Rock, 766 F.2d at 749. We also noted that although D'Oench Duhme and section 1823(e) would not bar the introduction of an oral agreement between a principal and a surety regarding the surety's right of recourse, they would bar reliance on "agreements between a bank and its obligor showing or attempting to show that the obligation was illusory or conditional." Id. at 754.
 
 
 85
 In this case, the Bathgate defendants' defense of unjustifiable impairment of collateral depends on their assertion that the February letter creates a genuine issue of material fact as to whether the Bathgate defendants were in default. See Bathgate defendants' Br. at 24. Thus, having rejected this assertion because D'Oench Duhme bars defenses based on the claims: (1) that the February letter made the Bank's preparation of the closing documents for the proposed loan a condition to the performance of Bathgate's obligations under the preexisting notes; and (2) that the February letter obligated the Bank to close the loan proposed, we conclude that the Bathgate defendants' defense of impairment of collateral also is barred.
 
 B. Bathgate's Claims Against The FDIC
 1. Breach of contract
 
 86
 Just as they bar the Bathgate defendants' defense of breach of contract, D'Oench Duhme and section 1823(e) bar the Bathgate defendants' claims that the Bank breached an oral agreement to extend the April 1 deadline for closing the consolidated loan proposed in the February letter and that the Bank breached the terms of the February letter by failing to prepare and provide the documents required to close the loan. We base this conclusion on the fact that neither claim is supported by a written document manifesting bilateral obligations, and that the February letter states that the Bank's commitment to refinance five of Bathgate's notes expires on April 1.
 
 
 87
 Moreover, as the FDIC points out, Bathgate has not rebutted specifically the FDIC's evidence that he failed to provide a substantial portion of the documents required by the February letter. See FDIC Br. at 29 & n. 18 (citing to the record before the district court). The February letter identifies specific documents Bathgate was to furnish Bank counsel prior to the closing of the transactions contemplated by the letter, see Bathgate defendants' App. II at 635-37 (see also Bathgate defendants' App. II at 603-05), 639-40,[10] and states that Bathgate must provide "[s]uch other information, documents, certificates, financial statements or opinions reasonably required by the Bank and its counsel," id. at 637.[11] The fact that "all required information was either in the Bank's possession or would have been provided to the Bank, if requested[,]" see Bathgate defendants' Br. at 13 (emphasis added), is immaterial since the February letter does not indicate that the Bank was obligated to request information which the February letter required Bathgate to provide. Surely if Bathgate wanted the Bank to close on the loan as contemplated by the February letter, he should have delivered the documents he was obliged to supply to the Bank. As he does not claim that he did so, the Bathgate defendants' breach of contract claims are barred even without regard for D'Oench Duhme and section 1823(e). As we noted above, "[w]here the movant has produced evidence in support of its motion for summary judgment, the nonmovant cannot rest on the allegations of pleadings and must do more than create some metaphysical doubt." Petruzzi's IGA, 998 F.2d at 1230. Thus, even if the Bathgate defendants' claim of breach of agreement were not barred, the FDIC would be entitled to summary judgment.
 
 
 88
 2. Trade Libel/Slander of Credit/Slander of Title
 
 
 89
 With regard to the Bathgate defendants' claims that the default letters, legal complaints and alleged statements to the media issued by the Bank constitute trade libel, slander of credit, and slander of title, the district court reached the following conclusions: (1) the default letters did not contain false statements since the closing date in the February letter had passed and thus Bathgate was actually in default; (2) the Bank's legal complaints were privileged from slander and defamation actions; and (3) the Bathgate defendants "failed to designate specific facts that raise a material issue for trial regarding ... [the Bank's] alleged republishing of the default letters and complaints to the press." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 16, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 33). Based on these findings, the district court granted summary judgment in favor of the FDIC on the Bathgate defendants' claims of libel and slander.[12]
 
 
 90
 The torts of trade libel, slander of credit, and slander of title require "the publication, or communication to a third person, of false statements concerning the plaintiff, his property, or his business." Henry V. Vaccaro Const. Co. v. A.J. DePace, Inc., 137 N.J.Super. 512, 349 A.2d 570, 572 (Law Div.1975); see also Wendy's of South Jersey, Inc. v. Blanchard Management Corp., 170 N.J.Super. 491, 406 A.2d 1337, 1338 (Ch.Div.1979). The Bathgate defendants maintain that they sufficiently have stated claims for trade libel, slander of credit, and slander of title to withstand summary judgment because the Bank and Bank officers published and communicated to third parties that Bathgate was in default. See Bathgate defendants' Br. at 31-33. According to the Bathgate defendants, the district court's conclusion that the Bathgate defendants were in default as of April 1, 1991, required it to engage in improper weighing of the evidence presented by the FDIC and the Bathgate defendants on this issue. Id. at 32. We disagree.
 
 
 91
 As the Bathgate defendants' defenses based on the February letter are barred, we must regard the Bathgate defendants as having been in default as of April 1, 1991. In any event, even if the defenses were not barred, the statement that the Bathgate defendants were in default was accurate with respect to the preexisting notes, for the existence of defenses to an action predicated on defaults merely excuses a defendant's failure to make a payment, but the defenses do not constitute payment. Thus, there is no genuine issue of material fact regarding the veracity of statements by the Bank and its loan officers asserting that Bathgate was in default.
 
 
 92
 Moreover, as the district court held, allegations made in pleadings filed in an action are privileged as long as they have some relation to the action. Wendy's of South Jersey, Inc. v. Blanchard Management Corp., 406 A.2d at 1338-39. There is no doubt that statements that Bathgate was in default on certain notes were related to the action to collect on those notes. Thus, we will affirm the district court's order for summary judgment in favor of the FDIC on the Bathgate defendants' counterclaims for libel, slander of credit, and slander of title.
 
 
 93
 3. Unlawful Interference with Prospective Economic Advantage
 
 
 94
 With regard to the counterclaim for tortious interference, the district court held that the Bathgate defendants "failed to raise an adequate response to the FDIC's argument that the claim is barred under the D'Oench, Duhme doctrine and Sec. 1823(e)." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 16, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 33).
 
 
 95
 "Under New Jersey law the five elements of a claim of tortious interference with a prospective or existing economic relationship are: (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir.1993) (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 186 (3d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 563 A.2d 31, 37 (1989)). The Bathgate defendants allege that Bathgate "had a reasonable expectation of selling his Collateral at full market prices," and that the Bank "intentionally and maliciously interfered by publishing false information through the Default Letters and statements to the media." See Bathgate defendants' Br. at 33-34. As we have concluded that the Bathgate defendants have not created a genuine issue of material fact regarding the veracity of statements that Bathgate was in default, we hold that the Bathgate defendants failed to state a claim for unlawful interference with prospective economic advantage. Moreover, Bathgate's expectation of selling his collateral at full market prices was based on the alleged agreement contained in the February letter which, if implemented, would have at least delayed the Bank's recourse to the collateral and, inasmuch as that agreement is not enforceable, his claim of unlawful interference with prospective economic advantage also is barred by D'Oench Duhme and section 1823(e). See Bathgate defendants' Br. at 9 (stating that the February letter "provided that the Commercial Notes would be repaid by Bathgate's execution of a new note and pledge of additional collateral.... In return, Bathgate was to repay the loans by personally selling collateral, such as real estate and partnership interests, pledged as security for the loans (the "Collateral"), over time, in order to achieve the greatest payment to the Bank, to protect Bathgate's equity in the Collateral, and to avoid publicity which would cause distress prices.").
 
 
 96
 4. Could the Bathgate defendants set off their alleged
 
 
 97
 damages against their obligations under the notes
 
 
 98
 and the guaranty?
 
 
 99
 The FDIC argues that even if D'Oench Duhme and section 1823(e) did not bar Bathgate's counterclaims or "Bathgate otherwise ... established a genuine issue of material fact, neither circumstance would bar the FDIC-Receiver from obtaining judgment against Bathgate or from foreclosing on the collateral ... [because] Bathgate must first obtain judgment on his unliquidated claims and then seek satisfaction of the judgment as a creditor of the failed institution, thereby entitling him to no more than a ratable distribution of the assets of the failed institution." See FDIC Br. at 34 (citing Beighley, 868 F.2d at 784 n. 12). In light of our holdings regarding Bathgate's counterclaims, we need not reach this issue.
 
 
 100
 C. The Motion For Leave To Amend the Third-Party Claims
 
 
 101
 On September 3, 1992, the Bathgate defendants filed a third-party complaint against the individual directors and officers of the Bank (the "Bank directors") pursuant to Fed.R.Civ.P. 14(a), which the district court dismissed by oral order on March 1, 1993. See Bathgate defendants' App. III at 1007-36 (transcript of proceedings). While the Bathgate defendants have not attempted to appeal from this order, they did file a motion for leave to file an amended third-party complaint. The district court denied that motion, holding that their proposed amendments would be futile. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 5, 1993 WL 661958 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1041).
 
 
 102
 The Bank directors argue that we lack subject matter jurisdiction over the Bathgate defendants' third-party complaint because it is prohibited by Rules 14(a) and 13(h). See Bank directors' Br. at 25-28. In its March 1, 1993 order dismissing the third-party complaint, the district court cited 28 U.S.C. Sec. 1367 as the basis for subject matter jurisdiction over the third-party complaint, and stated that "[a]lthough it appears that the Directors are more properly aligned as counterclaim-defendants [pursuant to Rule 13(h) ], [than as third-party defendants pursuant to Rule 14(a),] the Court is not persuaded that Bathgate's claims should be dismissed on this ground." See Bathgate defendants' App. III at 1028.
 
 
 103
 Rule 14(a) provides in pertinent part that "a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."
 
 
 104
 A third-party claim may be asserted under Rule 14(a) only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to defendant. If the claim is separate or independent from the main action, impleader will be denied.
 
 
 105
 C.A. Wright, A. Miller, M.K. Kane, Federal Practice and Procedure, Vol. 6, Sec. 1446, at 355-58 (1990). Thus, we conclude that the Bathgate defendants' pleading against the Bank directors does not qualify as a third-party complaint under Rule 14(a), because the Bank directors' liability is not derivative of the Bathgate defendants' liability on the notes for which the FDIC is seeking payment.
 
 
 106
 The Bank directors also maintain that joinder of the Bathgate defendants' claims against them was prohibited by Rule 13(h).[13] Rule 13(h) provides that "persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20."
 
 
 107
 Rule 13(h) only authorizes the court to join additional persons in order to adjudicate a counterclaim or cross-claim that already is before the court or one that is being asserted at the same time the addition of a nonparty is sought. This means that a counterclaim or cross-claim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party.
 
 
 108
 C.A. Wright, A. Miller, M.K. Kane, Federal Practice and Procedure, Vol. 6, Sec. 1435, at 270-71. The counterclaims against the FDIC have been dismissed. Moreover, at the time the district court denied the Bathgate defendants' motion for leave to amend their third-party complaint against the Bank directors, the district court already had granted summary judgment in favor of the FDIC on the FDIC's claims against the Bathgate defendants and on the Bathgate defendants' counterclaims against the FDIC. However, at the time that the pleading against the Bank directors was filed, the Bathgate defendants' counterclaims against the FDIC remained before the district court. Thus, the Bathgate defendants properly joined the Bank directors as additional parties to the counterclaim pursuant to Rule 13(h), which the district court cited in its order dismissing the counterclaims.[14]
 
 
 109
 Moreover, in In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig., 15 F.3d 1230, 1236-37 (3d Cir.1994), we held that the district court had "[a]ncillary subject matter jurisdiction ... over additional party defendants to a compulsory counterclaim, or over third party defendants," and that Congress "confirmed the principle of ancillary jurisdiction over counterclaim defendants in the enactment of the Judicial Improvements Act of 1990, 28 U.S.C. Sec. 1367." Section 1367 provides in pertinent part that district courts "shall have supplemental jurisdiction over all ... claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. Sec. 1367(a).[15] Thus, we conclude that the district court had subject matter jurisdiction over the Bathgate defendants' claims against the Bank directors.[16]
 
 
 110
 As noted above, the district court denied the Bathgate defendants' motion for leave to amend their "third-party" complaint against the Bank directors because it concluded that their proposed amendments would be futile. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 5, 1993 WL 661958 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1041). Rule 15(a) of the Federal Rules of Civil Procedure authorizes a party to amend its pleadings "as a matter of course at any time before a responsive pleading is served." In this case, although no responsive pleading had been filed, the district court concluded that "[r]ather than incur the added expense, delay, and inefficiency of permitting the amendment and then considering a motion to dismiss at a later date, the Court [would] focus[ ] on the ultimate issue of whether the motion to amend should be denied as futile." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 2, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1038). The futility of amendment is one of the factors that a trial court may consider in denying a motion to amend. See Averbach v. Rival Mfg. Co., 879 F.2d 1196, 1203 (3d Cir.1989), cert. denied, 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990). We review the district court's denial of a motion to amend for abuse of discretion. Id.
 
 
 111
 The Bathgate defendants argue that the district court erred in denying their motion for leave to amend their third-party complaint because the amended complaint stated causes of action for intentional interference with contractual relations and prospective economic advantage, slander of credit and title, violation of the New Jersey Consumer Fraud Act, misrepresentation, and tortious breach of the duty of good faith. See Bathgate defendants' Br. at 34-41.[17]
 
 
 112
 The district court held that the Bathgate defendants' claims for slander of credit and slander of title failed because they rested on the allegation that the Bank directors published false statements indicating that the Bathgate defendants were in default when it already had held that the Bathgate defendants "in fact, were in default." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 3, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1039). We agree that in light of the district court's holding and our decision to affirm that holding, the motion to amend the slander claims remains futile. Moreover, the Bathgate defendants' allegations, see Bathgate defendants' App. III at 1198-99, do not satisfy the pleading requirements for defamation claims because they do not identify the alleged defamatory statements or the source of the defamatory statements with sufficient specificity. See Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 109 (3d Cir.1988) ("a plaintiff must be required to set forth actionable statements with particularity"), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989); Zoneraich v. Overlook Hosp., 212 N.J.Super. 83, 514 A.2d 53, 63 (App.Div.) ("In the case of a complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication.... A plaintiff may be permitted to bolster a defamation cause of action through discovery, but not to file a conclusory complaint to find out if one exists."), certif. denied, 107 N.J. 32, 526 A.2d 126 (1986).
 
 
 113
 The district court held that the Bank directors could not be liable on the Bathgate defendants' claims of intentional interference with contractual relations and prospective economic advantage, because the court in Sammon v. Watchung Hills Bank for Sav., 259 N.J.Super. 124, 611 A.2d 674 (Law Div.1992), held that "an employee cannot be held liable for an act that is otherwise a tort when the employee is exercising a privilege of the principal." FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 3-4, 1993 WL 661958 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1039-40). The district court also based its holding on Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 563 A.2d 31, in which the court declined to decide whether "employees [ever] can be answerable for interfering with their employer's prospective contractual relationship," id. at 761, 563 A.2d 31, and stated that "[u]ltimate resolution of the question of whether an employee of a party to a prospective economic relationship can be held liable for tortious interference may require the Court to create a special cause of action against the employee," id. at 763, 563 A.2d 31. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 4, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1040).
 
 
 114
 In this case, the Bathgate defendants allege that the Bank directors were exercising the Bank's authority with regard to the disposition of Bathgate's notes. See, e.g., Bathgate defendants' App. III at 1170, 1196. Thus, the Bank directors were exercising a privilege of the principal. Since the Bank "cannot be liable on a cause of action grounded in unlawful interference with prospective economic advantage, fairness would require that [the directors with the authority to act on the Bank's behalf] ... be similarly insulated from liability on such a cause of action." Sammon v. Watchung Hills Bank for Sav., 611 A.2d at 676. Moreover, as the Bank directors point out, the Bathgate defendants have not cited any authority indicating that the New Jersey Supreme Court has created a special cause of action for tortious interference by employees of a party to an economic relationship. See Bank directors' Br. at 15. We think it would not recognize such an action, at least not in the circumstances here. Thus, we will affirm the district court's denial of the motion to amend the Bathgate defendants' tortious interference claims against the Bank directors.
 
 
 115
 The district court denied the motion to amend the New Jersey Consumer Fraud Act claim and common law fraud claim because the amended claims failed to satisfy the particularity requirement of Fed.R.Civ.P. 9(b). FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 5, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1041). Although the Bathgate defendants asserted that a fraudulent statement was "made to Bathgate that the closing on the February Commitment would be deferred beyond April 1, [1991]," they did not assert the identity of the speaker or speakers. Id. at 4-5 (see Bathgate defendants' App. III at 1040-41); see Saporito v. Combustion Eng'g Inc., 843 F.2d 666, 675 (3d Cir.1988) ("[a]lthough the appellants' complaint does indicate the general content of the [allegedly fraudulent] representations ..., it does not indicate who the speakers were ... or who received the information"), vacated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). Moreover, "there is no reason to believe that additional information is in the exclusive control of [the third-party defendants]." Saporito v. Combustion Eng'g Inc., 843 F.2d at 675.
 
 
 116
 It is true that "in the case of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir.1989). However, the Bathgate defendants assert individual fraud by the Bank directors. Furthermore, in Craftmatic, we stated that "even under a non-restrictive application of the rule [9(b) ], pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of facts upon which the allegations are based." Craftmatic, 890 F.2d at 645. In other words, "plaintiffs must accompany their allegations with facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendants' control." Id. at 646. The Bathgate defendants did not allege expressly that the necessary information lies within the third-party defendants' control nor did they provide a statement of facts indicating why the charges against the Bank directors are not baseless and why additional information lies exclusively within the Bank directors' control. See Bathgate defendants' App. III at 1201-03. Thus, we will affirm the district court's decision to deny the motion to amend the claims alleging fraud.
 
 
 117
 Finally, the district court held that the Bathgate defendants' amendment to its claim for breach of the duty of good faith would be futile because "in a lender-borrower relationship, there is no independent duty beyond [the] parties' contractual duties," FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 5, 1993 WL 661961 (D.N.J. July 19, 1993) (see Bathgate defendants' App. III at 1041) (citing Washington Steel Corp. v. TW Corp., 602 F.2d 594, 599-601 (3d Cir.1979), overruled on other grounds by Clark v. K-Mart Corp., 979 F.2d 965, 967 n. 4 (3d Cir.1992)), and " 'remedies in tort relating to a breach of contract may not be maintained in addition to those established under the contract itself in the absence of any independent duty owed by the breaching party to the plaintiff,' " id. (quoting International Minerals & Mining Corp. v. Citicorp North America, Inc., 736 F.Supp. 587, 597 (D.N.J.1990)). We do not reach these issues because, as the Bank directors point out, "[e]ven assuming [the Bank] did owe Bathgate some added duty of good faith, [the Bathgate defendants] fail to cite a single case for the proposition that non-parties to a contract can be held liable for a breach of a contractual duty of good faith and fair dealing," and we believe that the New Jersey Supreme Court would not recognize such a claim, at least in the circumstances of this case. See Bank directors' Br. at 25.[18] We will affirm the district court's holding with regard to the breach of duty of good faith claim on this basis. Thus, we will affirm in its entirety the district court's order denying the Bathgate defendants' motion for leave to amend their complaint against the Bank directors.
 
 III. CONCLUSION
 
 118
 In reaching our result, we have not overlooked that the D'Oench Duhme doctrine and section 1823(e) can lead to what might be considered a harsh result. Nevertheless, it seems to us that the federal precedents and the applicable New Jersey law have compelled our outcome. Consequently, the orders of the district court of March 18, 1993, and July 19, 1993, will be affirmed.
 
 
 
 [1]
 Pursuant to the "Agreement for Commercial Letter of Credit," NLA Associates, LGP-I Limited Partnership, and Novasau Associates agreed to pay the Bank on demand such amounts as the Bank paid to Chase Manhattan Bank pursuant to a $1,800,000 letter of credit issued by the Bank in favor of Chase. NLA also executed an undated demand promissory note in the amount of $1,800,000. The Bank advanced $1,688,178 under the terms of the letter of credit
 
 
 [2]
 These include the following items: (1) title insurance policies insuring the Bank's lien interest in the mortgaged properties; (2) insurance policies against hazards on the mortgaged properties; (3) insurance policies against floods on any areas designated as flood hazard areas; (4) proof that the mortgaged properties are not subject to the Environmental Cleanup Responsibility Act or other applicable environmental law and that all taxes and assessments against the properties have been paid; (5) a survey of each mortgaged property; (6) an "approved attorney" letter from a title insurance company indemnifying the Bank against fraud or failure by the closing attorney to comply with the closing instructions; (7) state and county UCC searches regarding Bathgate and any entities in which Bathgate has assigned his interest or which own collateral; (8) copies of "all partnership agreements, charter documents and other organizational documents or agreements of entities in which ... [Bathgate] has assigned interest or delivering or owning [c]ollateral in connection with the [l]oan"; (9) "[c]orporate resolutions adopted by the Board of Directors of Tuscol Development, Inc. and New Nas, Inc.--authorizing the issuance of applicable [c]ollateral documents in connection with the [l]oan"; (10) "[w]ritten consent of all partners of each partnership which grants or modifies a mortgage as collateral for the [l]oan or in connection with which the [b]orrower has granted a collateral assignment of his partnership interest, if required by the partnership agreement"; (11) affidavits with respect to environmental matters; (12) good standing certificates and corporate status searches with respect to Tuscol Development, Inc. and New Nas, Inc.; and (13) appraisals on the mortgaged property paid for by Bathgate. See Bathgate defendants' App. II at 603-05, 635-37, 639-40
 
 
 [3]
 The district court also granted summary judgment in favor of the FDIC against Airport Associates, but later vacated the order based on a settlement agreement between the FDIC and Airport Associates. The court denied without prejudice the FDIC's motion for summary judgment against the Landis defendants based on a forbearance agreement between the FDIC and these defendants. FDIC v. Bathgate et al., Civ. No. 91-2779 (consolidated), Memorandum and Order at 17, 1993 WL 661958 (D.N.J. Mar. 18, 1993) (see Bathgate defendants' App. I at 34)
 
 
 [4]
 The FDIC filed an appeal on September 19, 1993, from an order of the district court entered on July 19, 1993, granting a motion by Airport Associates to enforce a settlement. This appeal was docketed at No. 93-5572, but later was dismissed pursuant to Fed.R.App.P. 42(b) by order dated December 13, 1993
 
 
 [5]
 We have held that "a claimant against a failed thrift [or other depository institution] must exhaust FIRREA's administrative remedies before commencing a judicial action." Praxis Properties, Inc. v. Colonial Sav. Bank, 947 F.2d 49, 63 (3d Cir.1991) (citing 12 U.S.C. Sec. 1821(d)(13)(D)); see also FDIC v. Shain, Schaffer & Rafanello, 944 F.2d 129, 132 (3d Cir.1991) (Section 1821(d)(13)(D) "expressly withdrew jurisdiction from all courts over any claim to a failed bank's assets that [is] made outside the procedure set forth in section 1821."). In their responses to an inquiry by this court, both the Bathgate defendants and the FDIC stated that they complied fully with the administrative procedures enumerated in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. Sec. 1821(d)(3)-(d)(13). See Bathgate defendants' Response at 4-5; FDIC Response at 6. Thus, our jurisdiction over the Bathgate defendants' claims against the FDIC is not in question
 
 
 [6]
 Bathgate individually was the principal obligor on the notes, but as a matter of convenience we sometimes refer to the Bathgate defendants collectively, inasmuch as they have asserted counterclaims and a third-party complaint. Moreover, Novasau was one of the parties to the $1,800,000 "Agreement for Commercial Letter of Credit."
 
 
 [7]
 The protection of 12 U.S.C. Sec. 1823(e) applies to the FDIC in both its corporate capacity and its capacity as receiver for failed institutions. 12 U.S.C. Secs. 1821(d)(9)(A), 1823(e). See also Bowen v. FDIC, 915 F.2d 1013, 1015 n. 3 (5th Cir.1990); FDIC v. Hamilton, 939 F.2d 1225, 1230 n. 6 (5th Cir.1991)
 
 
 [8]
 See also Mainland Sav. Ass'n v. Riverfront Assocs., Ltd., 872 F.2d 955, 956 (10th Cir.) (held that D'Oench Duhme barred obligor's defenses of intentional fraud, gross negligence, reckless conduct, breach of an agreement to fund, and breach of the implied covenant of contractual fair dealing because "[n]othing in the note, accompanying security agreements or other documents pertaining to the transaction evidences any type of conditional promise or side agreement [to fund a second loan] ... of which the FSLIC might have been aware"), cert. denied, 493 U.S. 890, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989); Beighley v. FDIC, 868 F.2d 776, 784 (5th Cir.1989) (held that D'Oench Duhme bars defenses arising from bank's alleged agreement to finance future loans because it is "not clearly evidenced in the bank's records, and would not be apparent to bank examiners")
 
 
 [9]
 See also FDIC v. Hamilton, 939 F.2d at 1231 (recognizing Howell exception to D'Oench Duhme, but holding that obligors could not avail themselves of it because the note upon which their claim was based did not "facially manifest" the bank's "bilateral obligation to fund timely the line of credit," the obligation which the obligors claimed the bank had failed to satisfy); Bell & Murphy & Assocs., Inc. v. Interfirst Bank Gateway, N.A., 894 F.2d 750, 754 (5th Cir.) (holding that the Howell exception to D'Oench Duhme is only applicable if the bank's obligation appears on the face of the document the FDIC is seeking to enforce and the document is properly recorded in the bank's records), cert. denied, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990)
 
 
 [10]
 We already have set forth these items at note 2, supra
 
 
 [11]
 The February letter also states that "[t]his transaction will be closed on the Bank's determination, in its sole discretion, that there has been no material adverse change to the financial operations and condition of the Borrower from the time of application and that no event has occurred or information has become known that makes the Bank deem itself insecure in this transaction." See Bathgate defendants' App. II at 641. However, neither party grounds its argument on this provision
 
 
 [12]
 We apply New Jersey substantive law to the Bathgate defendants' counterclaims for trade libel, slander of credit, slander of title, and unlawful interference with prospective economic advantage because both the FDIC and the Bathgate defendants briefed the claims under New Jersey law, and no party asserts that federal law or the law of another state is applicable
 
 
 [13]
 Although Judge Cowen concurs in the judgment dismissing the third-party complaint against the directors, he would not dismiss it on the merits. He would dismiss it for the reasons stated in this footnote and without prejudice to any state law causes of action that the Bathgate defendants may bring against the directors in New Jersey state courts where the claims belong
 Although Rule 13(h), together with Rules 19 and 20, appears to give the district court broad power to join additional parties, the better understanding is that, as quoted in Judge Greenberg's opinion, "Rule 13(h) only authorizes the court to join additional persons in order to adjudicate a counterclaim or cross-claim that already is before the court or one that is being asserted at the same time the addition of a nonparty is sought. This means that a counterclaim or cross-claim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party." 6 Wright, Miller & Kane, Federal Practice and Procedure Sec. 1435, at 270-71. The "in order to adjudicate counterclaims" language underscores that the presence of additional parties is either necessary or close to necessary to the resolution of the counterclaims. The claims alleged in the third-party complaint are not "counterclaims" or "cross-claims" as required under Rule 13(h). Nor are the defendant directors necessary parties "in order to adjudicate [the] counterclaims" that the Bathgate defendants asserted against the Bank.
 Moreover, 28 U.S.C. Sec. 1367 may not cover the claims alleged in the third-party complaint. That provision requires that supplemental jurisdiction be exercised over certain claims if they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The claims against the directors are far removed from the original "case" or "controversy" that the Bank brought to collect the debt, and are analytically separate from the counterclaims that the Bathgate defendants asserted against the Bank. Although the claims against the directors and the counterclaims against the Bank may arise from the same transaction or common set of facts, Judge Cowen is not comfortable with holding that the claims alleged in the third-party complaint meet the requirement of being part of the same "case or controversy under Article III," over which the district court exercised original jurisdiction (that is, the bank's action to collect the debt), as Sec. 1367 provides.
 Judge Cowen believes the district court should have dismissed the third party complaint under Sec. 1367(c). The district court dismissed, without trial, the counterclaims the Bathgate defendants asserted against the Bank. The claims against the directors raise novel and complex issues of state law, which in the view of Judge Cowen are better adjudicated by New Jersey courts. Furthermore, the behavior of the directors was not the normal exercise of business judgment, but bordered on partisan politics, which may persuade the New Jersey courts to provide some remedy. According to Judge Cowen, these reasons counsel that the district court decline to take jurisdiction over the claims alleged in the third-party complaint.
 
 
 [14]
 Our conclusion is consistent with our decision in In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig., 15 F.3d 1230, 1237 n. 5 (3d Cir.1994). In that case, the defendant argued that the district court did not properly exercise its discretionary authority to join counterclaim defendants pursuant to Rule 13(h) because the district court made no reference to Rule 13(h). The defendant also argued that its counterclaim was prohibited by Rule 13(h) "inasmuch as under the rule a 'counterclaim ... may not be directed solely against persons who are not already parties to the original action.' " Id. (citing Baltimore & Ohio R. Co. v. Central Ry. Services, Inc., 636 F.Supp. 782, 786 (E.D.Pa.1986)). We rejected the defendant's arguments, holding that "the district court implicitly found in personam jurisdiction" over the additional counterclaim defendants, and that the defendant's counterclaim "was not directed solely against the counterclaim defendants," but was also directed against the plaintiff. Id
 
 
 [15]
 The Judicial Improvement Act of 1990 became operative on December 1, 1990, before the claims in this case were filed
 
 
 [16]
 We do note however, that district courts "may decline to exercise supplemental jurisdiction ... [if] the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. Sec. 1367(c)(3)
 
 
 [17]
 We apply New Jersey law to determine whether the Bathgate defendants' claims against the Bank directors were futile because both parties briefed the claims under New Jersey law, and neither party asserted that federal law or the law of any other state was applicable
 
 
 [18]
 The Bank Directors also allege that the Bathgate defendants other than Bathgate have no standing to sue the Bank directors as third-party beneficiaries of the agreement allegedly reflected in the February letter. In light of our disposition of the Bathgate defendants' claims against the Bank directors, we need not reach this issue