**Kim D. FIORIGLIO, Plaintiff,**

v.

**CITY OF ATLANTIC CITY, James Whelan, Paul Gallagher, Benjamin Brenner, and Joseph Rush, Defendants.**

No. CIV. A. 96–2295 (JEI).

United States District Court,
D. New Jersey.

March 5, 1998.

Perskie & Wallach by M. Daniel Perskie, Northfield, NJ, for Plaintiff.

Zeller & Bryant by Matthew Wieliczko, Woodcrest Pavilion, Cherry Hill, NJ, for Defendant City of Atlantic City.

Murray, Murray & Corrigan by David F. Corrigan, Little Silver, NJ, for Defendant James Whelan.

John H. Rosenberger, Linwood, NJ, for Defendant Paul Gallagher.

Levine, Staller, Sklar, Chan, Brodsky & Donnelly by John M. Donnelly, Brian J. Cullen, Atlantic City, NJ, for Defendant Benjamin Brenner.

Tuohy & Tuohy by Catherine Tuohy, Atlantic City, NJ, for Defendant Joseph Rush.

### OPINION

IRENAS, District Judge.

This matter appears before the Court upon the motion for summary judgment of defendants Atlantic City Mayor James Whelan ("Whelan"), Atlantic City Fire Chief Benjamin Brenner ("Brenner"), Atlantic City Solicitor Paul Gallagher ("Gallagher") and the City of Atlantic City on plaintiff Kim Fioriglio's ("Fioriglio") 42 U.S.C. § 1983 civil conspiracy claim, state constitutional claim, tortious interference with contractual advantage claim and New Jersey Conscientious Employees Protection Act ("CEPA"), N.J.S.A. 34:19–1 *et seq.*, claim. Because the Court finds that plaintiff has failed to present any facts under which he could succeed on these claims, the Court will grant the defendants' motions' on all of the claims and dismiss plaintiff's case in its entirety.

### I. BACKGROUND

On September 22, 1990, plaintiff took a written examination given by the New Jersey Department of Personnel ("NJDOP") for the position of Battalion Fire Chief for the City of Atlantic City. Pl. Compl. at ¶ 13. The NJDOP then administered an oral assessment examination of plaintiff on November 21, 1991. Pl. Compl. at ¶ 14.[1] This oral assessment examination is also calculated into a candidate's test score for Battalion Chief. *Id.* After these examinations, the NJDOP posted the exam results and plaintiff

---

1. All references to the plaintiff's complaint are references to his amended complaint, filed June 12, 1996.

had received the highest score, ranking him number one on the promotion eligibility list. *See* NJDOP Certification of Eligibility, Fire Battalion Chief, 9/22/90 Examination Results, Exh. K to Pl. Br. Several candidates questioned their scores and appealed the grading of the test. Pl. Br. at 1. An NJDOP test expert, in accordance with a Consent Decree which obligated the NJDOP to review the fire department's selection process for ranks above firefighter to ensure no adverse impact on black and Hispanic applicants, *see United States v. State of New Jersey,* 473 F.Supp. 1199 (D.N.J.1979), considered these appeals and determined that the examination would have to be rescored. *See Fioriglio v. New Jersey Dep't of Personnel,* Civ. A. No. 96–3342(JEI), 1996 WL 599400, at *1 (D.N.J. Oct. 15, 1996) (related case before this Court).

While the appeals were still pending, Mayor Whelan, on November 9, 1992, issued a memorandum which set forth the criteria to be considered in the event of a tie between candidates for Battalion Chief. Exh. C to Pl. Br. City residency was to be the first tie-breaking criteria and ranking on prior tests was to be the second tie-breaking criteria. *Id.* The Mayor indicated that these criteria had been utilized in deciding past ties in the police department. *Id.*

On November 20, 1992, the NJDOP posted the results of the rescored Battalion Chief examination and plaintiff's score placed him in a four-way tie for sixth place with Dennis Brooks ("Brooks"), Terrence Mooney ("Mooney") and Daniel Tamburilla ("Tamburilla"). Pl. Compl. at ¶ 21. In the period between November 20, 1992, and April 26, 1993, a number of Atlantic City Fire Captains were promoted to Battalion Chief, leaving plaintiff and the other three men in a tie for the next available promotion. Pl. Br. at 1. Then, on April 26, 1993, Brooks was promoted to the rank of Battalion Chief in accordance with the Atlantic City's veteran's preference policy. Thus, plaintiff now faced a three way tie with Mooney and Tamburilla. *See* Deposition of Benjamin Brenner, Exh. J to Pl. Br., at 38 [hereinafter Brenner Dep.]. Of these three candidates, plaintiff was the only city resident. Pl. Compl. at ¶ 29.

On February 1, 1994, plaintiff decided to run for Mayor of Atlantic City against the incumbent Mayor, defendant Whelan. Pl. Compl. at ¶ 22. Plaintiff alleges that he ran a vigorous campaign in which he heavily criticized Mayor Whelan's administration. Pl. Br. at 1. In his written campaign materials, plaintiff alleged that Mayor Whelan used his position as Mayor to hire political "cronies" to key governmental positions in order to gain political favor, that he hired incompetent persons, and that he created unnecessary and duplicative positions in the city government which then were given out to political friends and allies as a reward for political support. Pl. Compl. at ¶ 24; *see* Fioriglio Campaign Literature, Exh. G to Pl. Br. [hereinafter Campaign Literature]. Plaintiff also accused the Mayor of suppressing information at city council meetings and misusing tax monies. *See* Campaign Literature.

Plaintiff has accused Mayor Whelan of making various comments about his campaign for Mayor and the Mayor's alleged intention not to promote plaintiff. He claims the Mayor was overheard saying "F—ck you, F—ck you, you fireman and f—ck that Fioriglio, he will never be Mayor," Recorded Statement of Fire Inspector Scott McKnight, 5/28/96, Exh. M to Pl. Br., and "Kim would never be promoted as long as [I am] Mayor," Recorded Statement of Firefighter Wayne Gottwalls, 8/02/96, Exh. N to Pl. Br. He also claims the Mayor told another fire captain, "you firemen always want something and you go and support that asshole Fioriglio for Mayor against me and then you think I am going to give an appointment." Recorded Statement of James Boyer, 9/04/96, Exh. O to Pl. Br. As proof of these comments, he attempts to submit three unsigned, unsworn transcripts of tape recorded statements supposedly made by two firefighters and one fire captain who claim that the Mayor spoke out against plaintiff. Plaintiff allegedly tape recorded these statements and then transcribed them for the Court. However, none of the statements are sworn to or signed by the alleged speakers. Furthermore, neither plaintiff nor his attorney has submitted an affidavit attesting to the transcripts' validity.

On May 12, 1994, Mayor Whelan was elected to his second term. Pl. Compl. at ¶ 25. Plaintiff received fewer than 200 votes in the election. *See* Sept. 19, 1997 Deposition of Kim Fioriglio, Exh. C to the Certification of Brian J. Cullen, at p. 58 [hereinafter Fioriglio Sept. 19 Dep.].

On October 4, 1994, Mooney was given a temporary promotion to Battalion Chief. Plaintiff allegedly protested this appointment to the Atlantic City Firefighters' Local 198 and its president, defendant Joseph Rush. However, he received no support. He also protested to the NJDOP, claiming that he was the next to be promoted under the current policy due to his status as a city resident and alleging that any temporary appointment was improper because there was no provision in the NJDOP regulations providing for temporary appointments. *See* Pl. Br. at 2; Pl. Compl. at ¶ 34. The NJDOP determined there was no impropriety.

On October 14, 1994, the NJDOP issued new guidelines for the Disposition of a Certification. N.J.A.C. 4A:4–4.8. The new guidelines required officials with appointment authority to give a statement of the reasons why an appointee would be selected over another in the case of a tied score. *See id.* In response to the new guidelines and at the urging of Chief Brenner, the Mayor enacted Executive Order # 3 of 1994, effective as of December 5, 1994. Exh. I to Pl. Br. [hereinafter Executive Order # 3]. The Executive Order states that:

> The appointing authority shall weigh each of the [following] six criteria, without any particular hierarchy of order or priority: Criteria No. 1: *Disciplinary History.* The appointing authority shall consider all disciplinary action completed, major and minor, prior to and subsequent to the promulgation of the eligibility list. It is acknowledged that major discipline occurring in the five years prior to the promulgation of the eligibility list is factored into seniority, and the appointing authority will give this aspect due consideration so as to avoid double jeopardy.
> Criteria No. 2: *Education.* The appointing authority will give due consideration to educational background with particular emphasis to be given to management training.
> Criteria No. 3: *Sick Leave Abuse.* The appropriate utilization of sick time shall be considered by the appointing authority. The absence of abuse of sick time shall be an affirmative consideration within the purview of the appointing authority.
> Criteria No. 4: *Diversity.* The appointing authority shall, when available, exercise its discretion to promote diversity in the work place so as to appropriately reflect the makeup of the community.
> Criteria No. 5: *Residency.* The appointing authority shall give due consideration to permanent residents of the City as an affirmative criteria.
> Criteria No. 6: *Raw Score.* The appointing authority reserves the right to consider raw score as determinative in the absence of all other differentiation between or among candidates of equal rank. This criteria applies only to tie breakers, and not to determinations within the Rule of Three.

Plaintiff alleges that on or about December 2, 1994, defendants Whelan, Brenner and Gallagher met to discuss the tie-breaking policy which eventually became Executive Order # 3. Pl. Br. at 2. He claims that these defendants specifically set out to amend the criteria in a manner that would allow them to pass over the plaintiff for promotion. Pl. Br. at 2; Pl. Compl. at ¶ 30. As support for this allegation, plaintiff notes that Chief Brenner's assistant, Chief John Bereheiko, testified in his deposition that he felt that the tie breaking criteria policy was formulated, as were many other such policies, "behind closed doors." *See* Deposition of Chief John Bereheiko, Exh. E to Pl. Br., at 66 [hereinafter Bereheiko Dep.].

Based on Executive Order # 3 and his own evaluation of the three tied candidates, Brenner recommended to Whelan that first Mooney and later Tamburilla be selected as Battalion Chiefs. Brenner Dep. at 38. In New Jersey, an appointing authority is given broad discretion to choose among the top three individuals on an eligibility list when making a promotion. *See* N.J.S.A. § 11A:4–8

(authorizing certification of three eligibles); N.J.A.C. § 4A:4–4.2(c)(2) (same); N.J.A.C. § 4A:4–4.8(a)(3) (allowing appointment of one of the top three eligibles). Pursuant to this so-called "Rule of Three," Chief Brenner, on December 5, 1994, promoted to Battalion Chief both Mooney, who had been acting as temporary Battalion Chief, and Tamburilla, the two individuals on the promotion list with whom plaintiff was then tied. Brenner Dep. at 38; Pl. Compl. at ¶ 31. As a result, plaintiff was never promoted. Pl. Compl. at ¶ 32.

Plaintiff filed the present complaint in this Court on May 9, 1996. He subsequently amended his complaint on June 12, 1996. In his amended complaint, he alleges that Mayor Whelan, City Solicitor Gallagher, Fire Chief Brenner, Fire Department Supervisors Mooney and Brooks, and Atlantic City Firefighters Local 198 and its president, Joseph Rush, conspired to bypass him for a promotion to Battalion Chief in retaliation for his criticism of Mayor Whelan during his own mayoral campaign. His complaint seeks damages under 42 U.S.C. § 1983 for violations of the First Amendment of the United States Constitution, and under state law for violations of freedom of speech under the New Jersey State Constitution, tortious interference with prospective contractual advantage, and violations of CEPA. In an earlier opinion in this matter, we dismissed plaintiff's claims of defamation and violation of the New Jersey Law Against Discrimination for failure to state claims upon which relief could be granted. See Fioriglio v. City of Atlantic City, 963 F.Supp. 415 (D.N.J.1997).[2] Defendants Terrence Mooney, Dennis Brooks and Atlantic City Firefighters' Local 198 have all been voluntarily dismissed from the case.

## II. DISCUSSION

### A. Standard of Review

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id., 477 U.S. at 248. Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Idus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

### B. Consideration of Unsworn, Unsigned Taped Statements

The first task for the court in considering a motion for summary judgment is to deter-

---

2. Plaintiff had also filed a federal suit against the NJDOP and several state officials in which he alleged civil rights violations and reverse discrimination arising from the state's promotion testing procedures and the City's failure to promote him. We dismissed this suit on October 15, 1996. Fioriglio v. New Jersey Dep't of Personnel, Civ. A. No. 95–3422, 1996 WL 599400 (D.N.J. Oct.15, 1996).

mine which evidence it may consider in deciding whether a material factual dispute exists. The court generally must consider evidence set forth in five enumerated categories of materials, namely, "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." Fed.R.Civ.P. 56(c). Evidence that can be considered by a court under Rule 56 is normally of the same quality of evidence that the fact finder may consider at trial. Thus, for a statement to be admissible, it must be made under oath and on personal knowledge, it must set forth facts which would be admissible in evidence, and it must show that the affiant is competent to testify to the matters stated therein. *See* Fed.R.Civ.P. 56(e).

█ Plaintiff asks us to consider transcripts of statements allegedly made by fellow firemen and tape recorded by plaintiff for purposes of this litigation. Plaintiff submits these taped statements as proof of comments allegedly made by Whelan which might show the Mayor's retaliatory motives in not promoting plaintiff. In one comment, allegedly made to another fire captain, the Mayor supposedly said "you firemen always want something and you go and support that asshole Fioriglio for Mayor against me and then you think I am going to give an appointment." The other two declarants supposedly overheard the Mayor say: "F—ck you, F—ck you, you fireman and f—ck that Fioriglio, he will never be Mayor" and "Kim would never be promoted as long as [I am] Mayor." However, none of the statements are sworn to or signed by the alleged speakers. They were not given under oath and neither plaintiff nor his attorney has submitted an affidavit attesting to the transcripts' validity. Thus, these statements fail to meet the requirements of Fed.R.Civ.P. 56(e), and we will

not consider them for purposes of summary judgment.

### C. *Section 1983 Conspiracy Claim*

Plaintiff's first claim against the defendants alleges a civil conspiracy to bypass plaintiff for a promotion to Battalion Chief in retaliation for his challenge to the Mayor in the 1994 Atlantic City mayoral campaign. He claims that this conspiracy deprived him of his constitutional rights in violation of 42 U.S.C. § 1983.[3]

█ "[C]ivil conspiracy is [merely] a vehicle by which § 1983 liability may be imputed to those who have not actually performed the act denying constitutional rights." *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F.Supp. 808, 832 n. 23 (D.N.J.1993). As a result, "a § 1983 conspiracy claim is not actionable without an actual violation of § 1983." *Id.* Section 1983 applies to state actors or private actors acting under color of state law who deprive individuals of federally protected rights. *See Daniels v. Williams*, 474 U.S. 327, 330–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sample v. Diecks*, 885 F.2d 1099, 1108–10 (3d Cir.1989). To make out a § 1983 conspiracy claim, the plaintiff must make specific factual allegations of a combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right. *See Darr v. Wolfe*, 767 F.2d 79, 80 (3d Cir.1985); *Ammlung v. City of Chester*, 494 F.2d 811, 814 (3d Cir.1974).

---

**3.** 42 U.S.C. § 1985(3) sets forth a private right of action that specifically addresses conspiracies to deprive one of one's civil rights. Section 1985(3) generally describes a conspiracy of two or more persons for the purpose of depriving another of equal protection of the laws or equal privileges and immunities under the laws. A claim under § 1985(3) does not require state action, but it does require proof that a conspirator's action was motivated by a race-based or class-based,

invidious discriminatory animus. *See Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Lake v. Arnold*, 112 F.3d 682, 688 (3d Cir.1997). Thus, § 1985(3) would not be applicable here because plaintiff has not shown a race-based or class-based deprivation of his rights to equal protection. Furthermore, because he asserts his conspiracy claim against public actors rather than private actors, § 1983 is the more appropriate vehicle.

**386**

Although plaintiff's brief completely fails to address this issue, we must first determine whether plaintiff was deprived of a federally protected right. In essence, plaintiff's § 1983 claim is based upon the premise that plaintiff's First Amendment rights were violated when defendants conspired to retaliate against him for his mayoral campaign against Mayor Whelan.[4] It is well-established that political campaigning is protected speech under the First Amendment. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs, ... of course includ[ing] discussions of candidates...." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). As the Supreme Court has repeatedly noted, "'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *McIntyre*, 514 U.S. at 346 (quoting *Buckley v. Valeo*, 424 U.S. 1, 14–15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). Thus, if plaintiff is able to prove that his participation in such protected speech was a substantial motivating factor for the alleged conspirators' actions, he will have demonstrated a violation of § 1983. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997); *Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 829 (3d Cir.1994); *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993).

In order to survive summary judgment, plaintiff must demonstrate that there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objective of denying him a promotion in retaliation for his mayoral campaign. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (requirements for conspiracy under § 1983 between private actor and public officials). Plaintiff must prove with specificity the circumstances of the alleged conspiracy, such as those addressing the period of conspiracy, object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose. *See Labalokie v. Capital Area Intermediate Unit*, 926 F.Supp. 503, 508 (M.D.Pa.1996) (setting forth standard for making out a sufficient § 1983 conspiracy claim); *Loftus v. Southeastern Pennsylvania Transp. Auth.*, 843 F.Supp. 981, 986 (E.D.Pa.1994) (citing *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir.1989)) (applying this standard in the RICO context). When the sufficiency of civil rights allegations are challenged, the court must look beyond "conclusory allegations ... to the factual scenario itself to examine whether the conduct alleged, viewed most favorably to plaintiffs, is reasonably susceptible to falling within the conclusions alleged." *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir.1988).

The crux of plaintiff's § 1983 conspiracy claim is that Whelan, Brenner and Gallagher conspired to deprive him of a promotion by changing the policy setting forth the factors by which promotional ties are broken. Thus, plaintiff attempts to show that the object of their alleged conspiracy was to deny him a promotion in retaliation for his failed mayoral campaign against Whelan. Plaintiff claims that Whelan, Brenner and Gallagher accomplished this goal, primarily during a

---

4. In his complaint, plaintiff makes a broader assertion of constitutional deprivations, but in his submissions to the Court he has pursued only his theory based upon retaliation for his First Amendment activities in running against the Mayor. Thus, we consider only his allegation of a § 1983 conspiracy to deprive him of his federally protected First Amendment rights.

"surreptitious meeting," by formulating Executive Order # 3.

Critical to plaintiff's case is his argument that his "vigorous" mayoral campaign so upset the Mayor that he acted in conspiracy with the other defendants to deprive him of his promotion to Battalion Chief. However, plaintiff's supposedly "vigorous" campaign, in reality, was fairly insignificant and was not taken seriously by the Mayor. Plaintiff received under 200 votes in the election. Furthermore, the Mayor has testified that plaintiff's challenge was not an issue for him.

Q: .... Generally, you were aware that he accused you of creating jobs for friends and political cronies, correct?

A: No, not—Fioriglio wasn't on the radar screen, Mr. Perskie. I don't know how else to say that. I don't know all the names of all the candidates. I suspect, if you ask Governor Whitman or Mr. McGreevy or the libertarian candidate what some of the minor party candidates are specifically saying in their platform, I don't think they can answer that, and that was the position I was in, in 1994, with regard to Mr. Fioriglio.

I didn't know what he was giving out, or what he was saying, or what he was campaigning on because the analogy, again, is that he was very much a minor party candidate, if I can continue the analogy; and as such, it's not something the people who were involved in my campaign paid a lot of attention to.

Deposition of Mayor James Whelan, Exh. D to Pl. Br., at 15 [hereinafter Whelan Dep.].

Plaintiff speculates that defendants changed the policy used to break ties specifically so that he would be adversely affected under a consideration utilizing the new criteria. He claims that the purpose of the delineation of the six new criteria was not, as stated in Executive Order # 3, in response to the newly enacted N.J.A.C. 4A:4–4.85, which requires officials with appointment authority to give a statement of the reasons for their appointment choices in the case of a tied score, but rather to deny him a promotion. He refers to a December 2, 1994 meeting at which defendants Whelan, Brenner and Gallagher "met to discuss the amending of

the tie breaking criteria in a way that would allow the defendants to pass over the plaintiff for a promotion" and then alleges that "in accordance with their surreptitious meeting, the Mayor enacted Executive Order Number 3 of 1994." Pl. Br. at 4. However, plaintiff can offer no concrete proof that the December 2, 1994 meeting occurred. Neither Brenner nor Gallagher testified that a December 2, 1994 meeting took place and Whelan cannot recall any specific meeting held to deal with the tie-breaking promotional policy. Whelan Dep. at 69. Plaintiff's only evidence is the testimony of Deputy Chief Bereheiko who said that he suspected that Whelan, Brenner and Gallagher would have met in closed door sessions because few policy decisions are made "open forum." Bereheiko Dep. at 66.

Furthermore, when questioned about his conclusion regarding the alleged motives behind Executive Order # 3, plaintiff admits reliance upon unsubstantiated assumptions and speculation.

Q: So, there's also a part here that says that the meeting between defendants Whelan, Brenner, Mooney, Brooks and Gallagher and I'm going to quote: "Conspired to deceive the Plaintiff Fioriglio, of his rightful promotion by changing the regulations governing promotions and breaking the tie, to taking into account different factors under which the plaintiff would not emerge as the victor in this three-way tie situation." So, you don't know if that's what they talked about?

A: I—it's my belief that that's what they talked about. I have no personal knowledge as to what they said.

Q: You have no personal knowledge and the hearsay that you have heard, doesn't, no one says that they heard them talk about that, correct?

A: That's correct.

Sept. 26, 1997 Deposition of Kim Fioriglio, Exh. D to Certification of Brian J. Culler, at 29–30 [hereinafter Fioriglio Sept. 26 Dep.]. Thus, plaintiff admits he has no personal knowledge about what the defendants talked about during the alleged meeting at which Executive Order # 3 was formulated. He

has absolutely no evidence suggesting that defendants set out to retaliate against him for exercising his First Amendment rights. Nor can he point to any other evidence which demonstrates that defendants intentionally created new criteria that would adversely affect his chances of being promoted. Whelan and Gallagher both testified that they had discussions concerning promotional policy but that they did not have any particular discussion or discussions about plaintiff specifically.

From Whelan's deposition:

Q: Was there more than one meeting where you discussed the promotion list involving Fioriglio and the criteria to be utilized in those promotions?

A: Yes. I would say some of these meetings may have been on the fly. May have been other business, and this came up. I don't know that there's anything in my calendar that would say, you know, meeting with Brenner to discuss Fioriglio. I may have met with the chief on something else. May have been before or after a director's meeting with Paul Gallagher.

Clearly, this issue, in view of the fact that there were upcoming vacancies, battalion chief was an issue that needed to be resolved. If we were going to change the prior policy and institute a new policy, what was that new policy going to be. So I don't want to say there was a sense of urgency, but there was some focus on this to get this done so that we could go ahead. And if, in fact promotions were to be made, make whatever motion is going to be made.

Q: How many meetings of this nature took place with—again, I realize I can't pinpoint you specifically. It's not fair. Can you estimate how much such meetings took place with—starting with Paul Gallagher?

A: Again, the nature of the relationship that I have with the city solicitor was, Paul Gallagher or Mr. Cory, we meet on a regular basis to go over the topics of the day. There were not meetings—I don't recall. Maybe there was. I don't recall a meeting or a specific meeting to deal with tie-breaking promotional policy.

I do recall discussions taking place, probably, you know, three or four times with Mr. Gallagher, and three or four times with Chief Brenner and Chief Rifice and Andy Amir, our business administrator.

I think at one point we were of a consensus that the old policy didn't give us the flexibility that we wanted, and that a new policy needed to be derived. And, again, probably directed to Paul: Put something out, circulate it to the business administrator, chief of police, chief of fire, get their input, input from me, and put together a final document.

Q: These three to four meetings, you understood, went to discussing the tie-breaking criterion as involved Kim Fioriglio's promotional list?

A: No. It discussed a broad policy of tie-breaking. Some of the problems of the other policy were highlighted by the fact that we had a situation where Chief Brenner, in particular, he was in the fire department, was not happy with how that would play out.

Q: Let me ask it this way. How many meetings did you have—firstly, let's start with Paul Gallagher, and I want specific meetings that dealt with the issue of the promotional exam as it affected Tamburilla, Fioriglio, and Mooney.

A: I don't recall how many, if any, I had that were specifically dealing just with that promotion.

Q: How many meetings did you have non-specific where that issue came up with Gallagher?

A: Again, I don't recall. The best I can tell you, Mr. Perskie, is what I think I already told you. I probably discussed it on three or four occasions with Mr. Gallagher. I don't recall that it was discussed in the context specifically of Fioriglio, Tamburilla, Mooney, but, rather, in the context of—

Q: I see what you're saying.

A: —how do we break the ties; yet Chief Brenner is saying the policy in place right now is going to deny me the ability to promote Terry Mooney. I need Terry

Mooney on staff to do the budget, and so forth.

Whelan Dep. at 67–71.

From Gallagher's Deposition:

Q: Did you ever have discussions, prior to the institution of Executive Order Number 3, 1994, that you drafted with the Mayor, regarding Kim Fioriglio?

A: No.

Q: The Mayor never brought Kim Fioriglio up to you, in any way, for any reason at all; correct?

A: No.

Deposition of Paul Gallagher, Exh. V to Pl. Br., at 54 [hereinafter Gallagher Dep.]. Based on this lack of hard evidence, plaintiff has failed to show that Whelan conspired with either Brenner or Gallagher to retaliate against him for his failed mayoral campaign.

■ Unable to establish proof of any improper conduct during the formulation of Executive Order # 3, plaintiff next attempts to prove his conspiracy theory by alleging that defendant Brenner searched through his personnel files to discover which criteria would reflect badly upon him. He claims Brenner then brought the results of this alleged search to the attention of Whelan and Gallagher so that they would be able to draft a promotion policy which disadvantaged him. However, plaintiff has failed to offer any evidence in support of this allegation. Again, he relies purely on speculation and conjecture.

Q: What role did Ben Brenner have in your appointment; if you know?

A: In my appointment?

Q: Or your non-appointment, I'm sorry?

A: The exact role that he played, I couldn't say, because I wasn't at the meetings. But, I can say that he was a confidante of the Mayor. He provided the Mayor with information necessary to concoct the Executive Order that changed the way ties would be broken in the City of Atlantic City . . . .

Q: Now, you said you think Ben Brenner gave him, the Mayor, information necessary to concoct this new Executive Order.

Why do you think that? Do you have any evidence to support that?

A: The make up of the Executive Order, was produced to exclude me from the possibility of promotion.

Q: Do you have any knowledge of anything that Ben Brenner did, or any information he gave to the Mayor, necessary to create this Executive Order?

A: Well, if you look at the six criteria for promotions, these are all Atlantic City Fire Department specific, as well as, in some cases, general to other Fire Departments. But, disciplinary history, education, sick leave, and raw score are all specific to the Fire Department.

Q: What do you mean "specific to the Fire Department?"

A: Well, the Mayor wouldn't have any knowledge of raw score, without asking for it, without having it compiled by someone under him. Sick leave, education and disciplinary history.

Q: Well, I'm confused. I still don't understand what you mean by that. Are you saying—I'm trying to find out what you think Ben Brenner did in your own words. What do you think he did with or without the Mayor, to create or help create Executive Order Number 3?

A: Well, I don't think Ben Brenner is capable of doing anything without the Mayor's approval. So, with his approval, I believe he went into my personnel file and obtained data and compared that data to the personnel files of the other eligibles and came up with what they think is a way to exclude me from getting promoted.

Q: Why do you think he did that? Why do you think that those events occurred?

A: Because the Mayor asked Chief Brenner to do it.

Q: How do you know that? What do you base that on?

A: The fact that they're here.

Q: Anything else?

A: The fact that they're here.

Q: Anything else?

A: No. I can't think of any other reason that he would do it except he was told to do it by the Mayor.

Q: Did anyone tell you or do you have, has anyone told you that the Mayor told Ben Brenner to do this?

A: No.

Fioriglio Sept. 19 Dep. at 110–113. Thus, plaintiff's theory about Brenner searching through his personnel files is completely unsubstantiated.

██ Plaintiff's case against Gallagher is based on the allegation that Gallagher participated in the alleged meeting where the promotional policy was discussed and then drafted Executive Order # 3 in order to deprive plaintiff of a promotion. *See* Fioriglio Sept. 26 Dep. at 97. However, plaintiff admits that he has no information that would lead him to believe that Gallagher participated in any role except that of an attorney whose job required him to prepare documents at the direction of the Mayor.

Q: Do I understand correctly, from your testimony, earlier today, that, the reason Mr. Gallagher is a defendant, is because you believe he was a part of a meeting at which time the Executive Order, DM–2, was devised?

A: That's correct.

Q: And, other than your belief that he participated in that meeting, is there any other fact out there, that you believe, plays a role in his being a defendant today?

A: When you mention "fact," there, I have no additional facts. However, I have suspicions that there were other meetings, other than just this meeting, based on the size and complexity of the document.

Q: In other words, you think the process of drafting the document itself, may have taken several meetings?

A: I do.

Q: But other than whatever facts support the preparation of that document, there is nothing else beyond that, that brings Mr. Gallagher into the case?

A: No.

Q: Do you have any, aside from what you believe that Mr. Gallagher participated in any other role, other than the drafting of Executive Order, DM–2?

A: With regard to this case, no.

Fioriglio Sept. 26 Dep. at 96–97. Gallagher's actions in carrying out his duties as city solicitor by drafting a policy at the direction of the Mayor, in compliance with N.J.A.C. 4A:4–4.8, cannot constitute a violation of § 1983 without any evidence that the drafting was done with the purpose of retaliating against plaintiff.

Plaintiff also is unable to point to any evidence suggesting that he was treated in a negative manner by any of the defendants either during or after his campaign. In fact, as to defendant Gallagher, he admits that he does not know him personally and would not now know him if plaintiff were to see him. *See* Fioriglio Sept. 26 Dep. at 98. Furthermore, he offers nothing but unsubstantiated opinions that he has been threatened by either Whelan or Brenner.

Q: Personally, about you, has the Mayor, post May 14th, 1994 had any conversation with you at all?

A: Oh yeah. We've had conversations, not political. Not really political.

Q: Have those conversations been cordial or not cordial?

A: Yes, they were, they were politically correct. Cordial. They were okay.

Q: Has the Mayor threatened you or made threatening gestures or looks at you, since he ran for Mayor against you?

A: Yeah.

Q: Tell me about those....

A: After the campaign? I believe things have been done to me after the campaign, that, were motivated by the Mayor's agenda.

Q: I'm just talking about whether he has said anything, that you saw, heard him say, you personally, or saw him do, directed to you, glared at you or said an unfriendly word to you? Is there anything of that, that you can tell us about?

A: The only dealings I've had with Mayor Whelan were in public and that was usually during an incident on the Fire Department and there was never any glare or unfriendly note in public.

Q: Now, how about, have you heard of any words that he has said, to any other party, relative to you, after the campaign,

other than the May 14th statement you've told us about?

A: Nothing I can substantiate because people say things that I don't really put much value in. And what those things are, at this time, I don't even remember. But, if I didn't write them down, if I didn't include them in my appeal, if I didn't give them to my lawyer, they were meaningless or impossible to prove.

Q: Now, what about Chief Brenner, did he, during the campaign, did he make any comments to you or give you any hostile looks or anything that you can remember?

A: No, I can't say that he did.

Q: Post campaign, has he said anything to you, any words to you or made any gestures or looks to you that you found offensive or relevant to this proceeding?

A: Not particularly.

Fioriglio Sept. 19 Dep. at 89–91.

Furthermore, plaintiff admits that the newly adopted promotion criteria, disciplinary history, education, sick leave, residency and raw score, are appropriate considerations in deciding whom to promote. Fioriglio Sept. 26 Dep. at 121–39. He then acknowledges that he would not rank highly on some of these admittedly appropriate criteria. He admits that he has had disciplinary problems in his past. Oct. 9, 1997 Deposition of Kim Fioriglio, Exh. B to Certification of Brian J. Cullen, at 22–39 [hereinafter Fioriglio Oct. 9 Dep.]. He also does not dispute that the other two candidates who were being considered for a promotion have better educational backgrounds than he does.

Q: All right. I want to know if it is your position, in this litigation, that your educational background is equal to or superior to Mr. Mooney or Mr. Tamburilla?

A: Without defining— between the two, the fire-related education or the academic education, or the academic education. . . . I will say, for the record, that after hearing testimony, with regard to this litigation,

that, I believe both Mooney and Tamburilla have higher academic degrees than I do. Fioriglio Oct. 9 Dep. at 41–42.

Plaintiff simply cannot maintain a claim of civil conspiracy in violation of § 1983 on the unsubstantiated theory that defendants conspired against him in the process of formulating the new promotional criteria. He has presented this Court with no proof of improper conduct by the defendants upon which a jury could base a finding in his favor. The Mayor adopted rational promotion criteria, pursuant to N.J.A.C. 4A: 4–4–8.5, which in no manner discriminated against plaintiff or biased him in the promotional decision-making process. He has absolutely no proof that Brenner's decision not to promote him, as was Brenner's prerogative under New Jersey's Rule of Three, *see* N.J.S.A. § 11A:4–8 (authorizing certification of three eligibles); N.J.A.C. § 4A:4–4.2(c)(2) (same); N.J.A.C. § 4A:4–4.8(a)(3) (allowing appointment of one of the top three eligibles), was made to carry out a conspiratorial purpose of retaliation against him for his challenge to the Mayor during the 1994 mayoral race. Plaintiff also has not shown how Gallagher's role in bringing the City into compliance with N.J.A.C. 4A:4–4.8 violates his First Amendment rights. Because he has completely failed to show that any of the individual defendants conspired against him, he likewise has not demonstrated any theory upon which the City of Atlantic City can be held liable. Therefore, we will grant summary judgment on plaintiff's § 1983 conspiracy claim in favor of all of the defendants.

### D. *State Constitutional Claim*

 Plaintiff alleges that defendants violated his free speech rights protected by Article I ¶ 6 of the New Jersey Constitution by failing to promote him in retaliation for his mayoral campaign.[5] In order to succeed on this claim, plaintiff must show that he engaged in protected speech and that the speech was a substantial motivating factor in the adverse employment decision. *See, e.g., Connick v. Myers,* 461 U.S. 138, 142, 103

---

5. Plaintiff's complaint incorrectly cites Article I, ¶ 5. Article I, ¶ 6 provides for freedom of expression and is interpreted in the same way as the

First Amendment to the United States Constitution. *See Anderson v. Sills,* 143 N.J.Super. 432, 363 A.2d 381 (Ch.Div.1976).

S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). As discussed at length in Part II.C., plaintiff has no evidence that any action was taken against him as a result of his protected speech. Plaintiff has nothing but speculation and conjecture linking his speech during the campaign to his failure to be promoted and therefore his state constitutional claim, like his § 1983 claim, must fail. We will therefore grant summary judgment on defendants' motions for summary judgment on plaintiff's state constitutional claim.

### E. *Tortious Interference With Contractual Advantage*

▇▇▇▇▇ Plaintiff alleges that the defendants' failure to promote him constitutes an actionable claim under state law for tortious interference with economic or contractual advantage. Fundamental to a cause of action for tortious interference with economic or contractual advantage is the requirement that the claim be directed against defendants who are not parties to the relationship; one cannot interfere with one's own contractual or economic relationship. The New Jersey Supreme Court has clearly stated that a tortious interference claim must "be directed against defendants who are not parties to the relationship." *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 752, 563 A.2d 31 (1989). A situation among two parties to a contract would be governed by contract law. *Van Natta Mechanical Corp. v. Di Staulo*, 277 N.J.Super. 175, 182, 649 A.2d 399 (App.Div.1994). Because the City of Atlantic City is a party to the employment contract between itself and plaintiff, the claim against it must fail.

▇▇▇▇ Furthermore, the Court holds that the individual defendants, as employees of Atlantic City, cannot be liable for tortious interference. We dealt with this precise issue in *Hurley v. Atlantic City Police Dept.*, Civ. A. Nos. 93–260(JEI), 94–1124(JEI), 1995 WL 854478 (D.N.J. Aug. 4, 1995), and found that New Jersey law supported the proposition that city employees cannot be liable for interfering with another's contract with their common employer. We now repeat our *Hurley* analysis and renew our conviction that city employees cannot be found liable for tortious interference with a co-employee's contractual advantage:

> The *Printing Mart* court touched on, but did not resolve, this issue. In discussing the issue, the court first noted that employees could "theoretically" be held liable for interfering with another's contract with the employer because the employee is not a party to the contract. 116 N.J. at 761, 563 A.2d 31. Furthermore, employees generally are not relieved from individual tort liability simply because they act on behalf of the employer. *Id.* at 762, 563 A.2d 31. On the other hand, the court noted that while the corporate entity may be the technical party to the employment contact, the corporation can act only through its agents and employees. *Id.* at 761, 563 A.2d 31. Employees are also generally immune from tort liability where they exercise a privilege held by the employer. *Id.* at 762, 563 A.2d 31. These principles would indicate that the action would not lie against employees.

> The *Printing Mart* court, finding both that the record and arguments before it did not address the issue and that holding employees liable "may require the Court to create a special cause of action," declined to resolve this conflict. *Id.* at 763, 563 A.2d 31. However, post-*Printing Mart* courts have generally found that agents of a corporation cannot be liable for malicious interference with another's contractual relations with the corporation. *See F.D.I.C. v. Bathgate*, 27 F.3d 850, 875–76 (3d Cir.1994) (bank directors not liable for malicious interference with plaintiff's relations with bank); *Sammon v. Watchung Hills Bank*, 259 N.J.Super. 124, 127, 611 A.2d 674 (Law Div.1992) (officer and sole shareholder of corporation not liable for malicious interference). One court in this district has also found that where coemployees act within the scope of their employment in harassing a plaintiff, they cannot be held liable for tortious interference with the plaintiff's employment con-

tract. *Obendorfer v. Gitano Group, Inc.,* 838 F.Supp. 950, 956 (D.N.J.1993).

*Hurley,* 1995 WL 854478 at *13–14.

As in *Hurley,* it appears here that all actions allegedly taken by the individual defendants against plaintiff were in the course of their employment. *See Obendorfer,* 838 F.Supp. at 956 (dismissing claim where plaintiff alleged that all harassing acts by supervisory employee were within scope of employment). Furthermore, the *Printing Mart* court indicated that a tortious interference claim against an employee of a party to the contract might require the creation of a new cause of action, and, as we noted in *Hurley,* it is not the role of this court to create new actions under New Jersey law. *See Bathgate,* 27 F.3d at 876. Thus, we will grant both the City's and the individual defendants' motions for summary judgment on plaintiff's tortious interference with contractual advantage claim.

### F. *CEPA Claim*

 CEPA, the New Jersey equivalent of a whistleblower statute, protects from retaliation employees who disclose or threaten to disclose an employer's wrongful or illegal activities, or who testify before a public body regarding an employer's violation of a law. N.J.S.A. § 34:19–3. To succeed on a CEPA claim, a plaintiff must show (1) that he disclosed or threatened to disclose the activity to a supervisory or public body, (2) that he suffered an adverse employment decision, and (3) a causal connection between the two. *Keelan v. Bell Communications Research,* 289 N.J.Super. 531, 538, 674 A.2d 603 (App. Div.1996); *Young v. Schering Corp.,* 275

N.J.Super. 221, 233, 645 A.2d 1238 (App.Div. 1994), *aff'd,* 141 N.J. 16, 660 A.2d 1153 (1995).

 Because of the lack of evidence presented by plaintiff in support of his theory that he was not promoted in retaliation for his failed mayoral campaign, *see supra* Part II.C., we find that plaintiff has similarly failed to demonstrate sufficient evidence in support of his CEPA claim. Although we disagree with defendant Brenner's arguments that plaintiff's campaign comments against the Mayor were not made to a public body and therefore do not come within the protection of CEPA, we agree with the defendants that plaintiff has failed to show that the adverse employment action he suffered was causally connected to his campaign comments. Plaintiff has produced no evidence to support his theory that his failure to be promoted was causally connected to his failed mayoral campaign. Without any evidence from which a jury could infer that he was not promoted because of his mayoral campaign rather than because of a Rule of Three determination by Brenner in accordance with Executive Order # 3, plaintiff simply cannot survive summary judgment.[6] Therefore, we will grant summary judgment in favor of the defendants on plaintiff's CEPA claim.

### G. *Absolute or Qualified Immunity*

Defendants Whelan and Gallagher have both put forth the defense of absolute and/or qualified immunity. Because we are granting summary judgment on the merits in favor of all of the defendants, including Whelan and Gallagher, we need not address the issue of immunity.

---

6. We note that the elements which a plaintiff must prove in order to succeed on a CEPA claim are very similar to those necessary to prove a violation of Title VII and that courts commonly utilize principles from the Title VII landscape in analyzing CEPA claims. *See Bowles v. City of Camden,* 993 F. Supp.255 (D.N.J.1998) (Irenas, J.). Under such an analysis, litigants and courts often proceed on a "pretext" theory whereby plaintiffs are required to make out a prima facie case of retaliation by showing the three CEPA elements. *See id.* at 261. If the plaintiff succeeds in making out a prima facie case, the burden then shifts to the defendant to advance a legitimate, nondiscriminatory reason for making the adverse employment decision. *See id.* Once the defendant has proffered such a reason, the plaintiff must raise an issue of fact regarding whether the defendant's proffered explanation is pretextual or whether retaliatory discrimination was more likely than not a determinative factor in the decision. *See id.* Because none of the litigants here have proceeded on this pretext theory analysis and because we find that plaintiff's failure to present sufficient evidence of a causal connection has precluded him from making out even a prima facie case of retaliation, we need not further address the burden-shifting mode of analysis in order to dispose of plaintiff's CEPA claim.

## H. *Defendant Joseph Rush*

Defendant Joseph Rush, the president of the voluntarily dismissed defendant Atlantic City Firefighters' Local 198 during the relevant period of events, has not submitted his own motion for summary judgment. Plaintiff has not mentioned defendant Rush in any of his present submissions and we do not see any manner in which he could be found liable. Thus, as we are granting the other defendants' motions for summary judgment on each of plaintiff's claims because plaintiff has failed to set forth any genuine issues of fact upon which a jury could base a finding his favor, we will also dismiss all claims against defendant Rush.

## III. CONCLUSION

For the foregoing reasons, the Court will grant summary judgment in favor of the defendants on plaintiff's § 1983 conspiracy claim, state constitutional claim, tortious interference claim, and CEPA claim. As plaintiff no longer has any claims remaining against any defendants, we will dismiss plaintiff's complaint in its entirety. An appropriate order will follow.